Andrew Cole Smith
Reg. No. 16882-029
Federal Correctional Institution
P.O. Box 800
Herlong, CA 96113



RECEIVED

OCT 17 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

UNITED STATES OF AMERICA,
            Plaintiff,


v.                                          Case No. 3:16-cr-03048-MWB

                                            MOTION UNDER 18 U.S.C. 3582(c)(1)(A)
                                            FOR COMPASSIONATE RELEASE

ANDREW COLE SMITH,
            Defendant.

**TABLE OF CONTENTS**

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B. Factual History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.   Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A. Mr. Smith Has Exhausted His Administrative Remedies. . . . . . . . . . . . . 9

      B. Extraordinary and Compelling Reasons Warrant a Sentence . . . . . . . . . 9
         Reduction

         1. The First Step Act's Heightened Requirement for Enhancing . . . . 9
            a Drug Sentence Is an Extraordinary and Compelling
            Circumstance Warranting Reduction in Sentence

         2. Mr. Smith's Rehabilitation Provides an Additional . . . . . . . . . . . 13
            Extraordinary and Compelling Reason for Relief

         3. The Conditions of Confinement During the COVID-19 . . . . . . . 16
            Pandemic Present Extraordinary and Compelling
            Circumstances that Warrant Reduction in Sentence

         4. The BOP's Failure to House Mr. Smith Within 500 Miles. . . . . 21
            of his Release Residence Is Yet Another Extraordinary and
            Compelling Reason for a Reduced Sentence

         5. Mr. Smith's Disproportionate Sentence Constitutes An . . . . . . . 24
            Extraordinary and Compelling Reason Warranting Relief

      C. The Statutory Sentencing Factors Support a Time-Served Sentence . . . . 27

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# I. INTRODUCTION

The First Step Act (FSA), enacted on December 21, 2018, "significantly altered the landscape of compassionate-release motions." *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020)(quoting *United States v. Rodriguez*, 451 F.Supp.3d 392, 398 (E.D. Pa. 2020)). No longer are compassionate release motions tied only to elderly inmates or those with chronic health conditions as set forth in U.S. Sentencing Guidelines Manual 1B1.13. District courts are "empowered" to "consider any extraordinary and compelling reason for release that an inmate might give." Id. at 284 (quotation citation omitted)(emphasis in original).

Defendant and federal prisoner, Andrew Cole Smith, relying on that Act, submits that "extraordinary and compelling reasons" warrant a sentence reduction for the following reasons. His argument is complex but it boils down to this: If Mr. Smith were sentenced today, he'd be looking at a very different situation with no threat of a mandatory life sentence.

As a preliminary matter, Mr. Smith exhausted his administrative remedies by submitting a compassionate release request to the warden at FCI Herlong and then waiting the requisite thirty days before seeking court relief. See 18 U.S.C. 3582(c)(1)(A).

On the merits, there are extraordinary and compelling reasons to modify his sentence. See id. 3582(c)(1)(A)(i). There are two main bases for this conclusion. First, the changes in the legal and factual landscape confirm that Mr. Smith's 188-month sentence may be excessive. See e.g. *United States v. Brooker*, 976 F.3d 228, 238 (2d Cir.

2020)(relating the legislative history of the FSA which recognized a reduction may be appropriate when "extraordinary and compelling circumstances justify a reduction of an unusually long sentence"). This is so because, in addition to changing the compassionate release framework, it also rendered it more difficult for the government to seek a section 851

sentencing enhancement under Title 21. It is now clear that Mr. Smith's Iowa state possession of methamphetamine conviction and possession of anhydrous ammonia with intent to manufacture methamphetamine convictions would no longer qualify as 21 U.S.C. 851 predicates. Cf. *United States v. Oliver*, 2021 WL 503298, at *7-9 (8th Cir. Feb. 11, 2021) (explaining the FSA changes to 851 enhancement which now require that a conviction be a "serious drug felony" as defined in 18 U.S.C. 924(e)(2)).

Second, Mr. Smith's post-offense rehabilitation has been outstanding. He has stayed out of trouble, maintained employment while in prison, and completed more than 1,000 hours of educational and rehabilitative programming. Numerous courts have cited precisely this sort of evidence as an extraordinary and compelling reason supporting a sentence reduction under section 3582(c)(1)(A). See Brooker, 976 F.3d at 237-38; see also *United States v. Quinones*, 2021 U.S. Dist. Lexis 37628, 2021 WL 797835, at *2 (S.D.N.Y. 2021)(citing "substantial evidence of rehabilitation, including a successful prison record, exemplary work history, and countless programming certificates" as evidence of defendant's rehabilitation).

Third, the measures BOP has taken to combat the pandemic renders incarceration

more onerous. When this Court sentenced Mr. Smith, it could not foresee the impact COVID-19 would have on the prison environment. Courts recognize this unexpected harshness warrants a sentence reduction. See, e.g., *United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007)(noting sentencing courts may, but are not required to, find "that the harsher the conditions the shorter the sentence should be"); see also *United States v. Macfarlane*, 438 F.Supp.3d 125, 127 (D. Mass. 2020)(granting a sentence reduction and noting "two-week confinement in solitary quarantine in a higher security facility is the equivalent of two months in the Camp to which he was originally assigned").

Finally, the government will be unable to meet its burden of proving that reducing Mr. Smith's sentence is inconsistent with 18 U.S.C. 3553(a) sentencing factors. See *United States v. Greene*, 2021 WL 35446, at *16 (D.D.C. Feb. 2, 2021)(explaining that, once an inmate proves that "extraordinary and compelling reasons" exist to modify a sentence, "the presumption then effectively shifts in favor of release" (citing *United States v. Johnson*, 464 F.Supp.3d 22, 30-31 (D.D.C. 2020)); cf. 18 U.S.C. 3582(c)(1)(A) (explaining that a court should consider 3553(a) factors before granting a sentence modification request); see also 18 U.S.C. 3553(a)(providing the applicable federal sentencing factors, cabined by the parsimony clause which states that the sentence should be sufficient, but not greater than necessary, to achieve the listed goals).

Mr. Smith's current projected release date is March 26, 2030. To date he has served approximately six years in custody. His sentence is much greater than that of his codefendants, some of whom were the drug suppliers in the conspiracy. Preventing this

disparity from growing ever wider is an appropriate consideration. See 3553(a)(6) (explaining a sentence should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

Mr. Smith's age, history of non-violent conduct, and solid release plan, along with supervision by the United States Probation Office, will ensure that granting this request would not unduly endanger the community.

This Motion respectfully asks this Court to modify his sentence by reducing his term of imprisonment to 120 months; the mandatory-minimum in this case. In doing so, this Court is free to add any additional terms or conditions it wishes, including converting the unserved term of imprisonment to supervised release. See 3582(c)(1)(A).

## II.    BACKGROUND

A. Procedural History

On November 16, 2016, a federal grand jury sitting in the Northern District of Iowa returned a two-count indictment against Mr. Smith. Count 1 of the indictment alleged conspiracy to distribute 500 grams or more of methamphetamine, in violation of sections 841(a)(1), 841(b)(1)(A), and 846. Count 2 of the indictment alleged possession with intent to distribute 50 grams or more of methamphetamine, in violation of sections 841(a)(1) and 841(b)(1)(B).

On April 7, 2017, Mr. Smith appeared before United States Magistrate Judge Kelly K.E. Mahoney and entered a plea of guilty to Count 1 of the indictment. On that same

day, Judge Mahoney filed a Report and Recommendation in which she recommended that Mr. Smith's guilty plea be accepted. See *United States v. Smith*, 2017 U.S. Dist. Lexis 54147 (N.D. Iowa Apr. 7, 2017). On April 10, 2017, United States District Judge Mark W. Bennett issued an Order accepting the Magistrate's Report and Recommendation, finding that Mr. Smith's guilty plea was knowingly and voluntarily made. See *United States v. Smith*, 2017 U.S. Dist. Lexis 54146 (N.D. Iowa April 10, 2017).

On August 3, 2017, Mr. Smith appeared in this Court for sentencing. The Court sentenced him to 188 months of imprisonment, to be followed by 5 years of supervised release.

Mr. Smith did not appeal his conviction or sentence to the United States Court of Appeals for the Eighth Circuit or the Supreme Court of the United States.

On December 21, 2018, President Donald J. Trump signed into law the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018).

B. Factual History

Mr. Smith's initial drug abuse can be traced to a leg injury. When he was just 15 years old, Mr. Smith was involved in a car accident in which he shattered his femur. The injury was very painful and since it was to the largest bone in his body, his mobility was severely limited. One night while a young Smith laid in his bed, convalescing and fighting the pain, his mother's boyfriend, who was a small-time drug dealer and heavy user, came into his bedroom and left a line of methamphetamine on the bathroom counter. The boyfriend informed the young Smith that the drug would help make the pain go away

and that he would feel much better. The 15-year old Smith tried the drug and became

hooked. For the next six months, the boyfriend would frequently give methamphetamine

to Mr. Smith while he recovered from his injuries.

After he recovered, Mr. Smith was sent to a state training school for three years as

part of his punishment for his role in the car theft that lead to his injury. Once he reached

the age of 18, he was released from the training school and returned home. Though three

years had passed, the environment was essentially the same. However, Mr. Smith had

now reached the age of adulthood and was no longer bound to a bed due to an injury.

Thus, his mother's boyfriend required Mr. Smith to pull his own weight, if he wanted to

partake in using the methamphetamine that the boyfriend was offering. It started small.

The boyfriend had Mr. Smith going to various stores to either purchase or steal the

ingredients (Sudafed, lithium batteries, etc.) needed to make more methamphetamine.

From there it grew into the boyfriend teaching Mr. Smith how to sell methamphetamine

and eventually into how to actually make the methamphetamine. By then, of course, Mr.

Smith was an addict whose life revolved around getting his next high.

And as the methamphetamine trade evolved; moving away from the making of

anhydrous ammonia methamphetamine to crystal methamphetamine, Mr. Smith evolved

with it. The bigger his addiction became, the more risk he took to satisfy that addiction.

He often lied to people and became a habitual cheater. He constantly chose alleged

"friends," those who could help him score his next high, over his family -- who continued

to support him throughout his addiction.

It all came to screeching halt on November 16, 2016, when a federal grand jury

indicted him. Not that Mr. Smith changed immediately. Rather it was a gradual process;

being away from the people and environment that supported his addiction, allowed Mr.

Smith to take stock of his life and re-evaluate what was important to him. On November

20, 2017, Mr. Smith enrolled in an Electrical Apprenticeship program at FCI Tucson and

began the slow climb toward rehabilitation and becoming a better person.


## III.　LEGAL STANDARDS

Before petitioning the court directly for compassionate release, an incarcerated

inmate must satisfy one of two prerequisites: (1) fully exhaust "all administrative rights to

appeal a failure of the Bureau of Prisons to bring a motion [for compassionate release] on

the defendant's behalf," or (2) demonstrate "the lapse of 30 days from the receipt of such a

request by the warden of the defendant's facility." 18 U.S.C. 3582(c)(1)(A). the earlier of

these two dates controls.

Once the requisite time period has lapsed, a court may consider the motion on its

merits and reduce the term of imprisonment if it finds that "extraordinary and compelling

reasons" warrant such a reduction. Id. When adjudicating compassionate release motions,

courts are empowered to consider a wide range of circumstances as extraordinary and

compelling reasons for release. See *United States v. Aruda*, 993 F.3d 799, 801-802

(9th Cir. 2021).

"The compassionate release statute, 3582(c)(1)(A), vests the district court with

broad discretion 'to consider any extraordinary and compelling reasons for release that a defendant might raise[.]'" Id. at 802 (citing *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020)(quoting *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020)).

In early 2020, some district courts in this circuit considered defendant-filed compassionate release motions under the narrow strictures prescribed in U.S.S.G. 1B1.13. However, this Court ruled as early as December 2020 "that Section 1B1.13 is therefore not binding on motions filed by defendants after the First Step Act." *United States v. Zirkelbach*, 2021 U.S. Dist. Lexis 152744 (N.D. Iowa Aug. 11, 2021)(citing *United States v. Crandall*, 2020 U.S. Dist. Lexis 227015, 2020 WL 7080309, at *5 (N.D. Iowa Dec. 3, 2020)). See also *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir.2021) (Neither 1B1.13 "nor the commentary to it binds a district court addressing a prisoner's own motion under [ ] 3582"). Thus, cases such as Crandall expanded a district court's discretion to grant compassionate release after reviewing the totality of the circumstances presented in an inmate's case. *See, e.g., McCoy*, 981 F.3d at 281; and *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020).

The statute also contemplates that extraordinary and compelling reasons may warrant a sentence reduction even if there is some safety concerns posed by releasing a defendant. See *United States v. Aruda*, 996 F.3d 790, 791 (9th Cir. 2021)(clarifying that section 1B1.13(2)'s "[non-dangerousness] finding is not statutorily required" when a defendant brings a motion for compassionate release.

## IV. ARGUMENTS

A. Mr. Smith Has Exhausted His Administrative Remedies.

On November 29, 2021, Mr. Smith filed his request for compassionate release with the warden at FCI Herlong. See Exhibit A. Mr. Smith argued, inter alia, that his lengthy sentence, post-conviction rehabilitation, change in federal law, conditions of confinement, family circumstances, and over-representation of his prior offenses provided extraordinary and compelling reasons for compassionate release. The warden failed to respond to Mr. Smith's request within the 30-day time period. See *United States v. Cantu*, 2019 WL 24489923, at *3 (S.D. Tex. June 17, 2019)("Under the newly amended [ ] 3582(c)(1)(A) [the defendant] has standing to bring this motion because more than 30 days has elapsed between his reduction-in-sentence request to the warden and a response."). Thus, this matter is ripe for review.

B. Extraordinary and Compelling Reasons Warrant a Sentence Reduction to 120-months.

1. The First Step Act's Heightened Requirement for Enhancing a Drug Sentence is an Extraordinary and Compelling Circumstance Warranting Reduction in Sentence.

At the time of the indictment, the one count of distribution of 500 gram or more of methamphetamine carried a mandatory minimum sentence of ten-years. See 21 U.S.C. 841(b)(1)(A). Because Mr. Smith had a prior Iowa conviction for possession of methamphetamine and two prior Iowa convictions for possession of anhydrous ammonia

9

with intent to manufacture methamphetamine, the government had the option of filing an enhancement under Title 21, United States Code, section 851. Had it done so, Mr. Smith would have faced a mandatory life sentence. See id.

Because of this exposure, Mr. Smith entered into a plea agreement with the United States in which he agreed to plead guilty to Count 1 of the indictment, charging him with distributing 500 grams or more of methamphetamine.

Given his potential exposure, Mr. Smith's agreement to plead guilty to a sentencing carrying 15-17 years seems reasonable. The problem with that assumption is that the First Step Act amended section 851 in a manner that eliminated the possibility of Mr. Smith's prior drug offenses serving as predicate offenses.

On December 21, 2018, the legal landscape shifted when Congress passes the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018). In addition to the changes to the compassionate release requirements, the Act rendered it clear that Mr. Smith would not be facing a life sentence were his case brought today.

To explain, section 401 of the Act amended the sentencing enhancements under Title 21, United States Code, section 851 in two relevant ways. First, it reduced the mandatory minimums following a section 851 notice from 20 to 15 years for one qualifying conviction and from life to 25 years for two or more qualifying convictions. See 21 U.S.C. 841(b)(1)(A); see also *United States v. Asuncion*, 974 F.3d 929, 930-31 (9th Cir. 2020)(describing these changes).

Second, and more salient to Mr. Smith, the amendment altered the kinds of

convictions for which a section 851 enhancement could apply. It changed the broad "felony drug offense" category (comprising simple drug possession) to the much narrower "serious drug felony" category (comprising manufacture or distribution punishable by at least ten years, for which the defendant served at least twelve months within the last fifteen years). See 21 U.S.C. 802(57); see also 18 U.S.C. 924(e)(2)(A)(providing the definition of "serious drug offense").

Mr. Smith had three prior drug offenses, an Iowa state conviction for possession of methamphetamine and two Iowa convictions for possession of anhydrous ammonia with intent to manufacture methamphetamine, that potentially met the pre-FSA definition of "felony drug offense." It is now clear for a couple of reasons that they would not qualify after the FSA.

First, an 851 predicate based on state law must now involve manufacturing or distribution of a controlled substance. See 924(e)(2)(A)(ii). Thus, Mr. Smith's 2010 conviction for possession of methamphetamine no longer qualifies.

Second, a prior offense counts as a "serious drug felony" only if offense is punishable by at least ten years. See 21 U.S.C. 802(57). Mr. Smith was convicted in 2003 and 2006 under Iowa Code 124.401(4)(d) for possession of anhydrous ammonia with intent to manufacture methamphetamine. However, maximum punishment for a conviction under that statute is only five years.

These changes in the factual and legal landscape constitute an extraordinary and compelling reason to modify Mr. Smith's sentence. Doubly so because without the

Government's ability to use the section 851 enhancement "as a plea hammer to induce a defendant to plead," *United States v. Young*, 960 F.Supp.2d 881, 888 (N.D. Iowa 2013), the plea deal the Government would have had to offer Mr. Smith would have had to be more favorable in order to avoid a costly trial.

To reiterate, when Mr. Smith was originally charged, he faced a possible mandatory-minimum life sentence by the application of two 851 sentencing enhancements, which the Government repeatedly threatened to file in this case. By holding that double-headed hammer over Mr. Smith's head, the Government was able to coerce Mr. Smith into pleading guilty in the case. That decision result in an advisory Guidelines range of 188 to 235 months, the lowest sentence that he could receive (barring the awarding of a downward departure or variance). The Court subsequently sentenced Mr. Smith to 188 months.

If Mr. Smith were charged today, however, he would not face a mandatory-minimum life sentence, as his sentence would not be affected by any application of section 851. Importantly, the advisory Guideline range of 188 to 235 months would be the highest sentence that he could receive (barring the awarding of an upward departure). But as noted above, the Government would have had to offer Mr. Smith a better deal than the one that it previously offered him in order to induce him to plead guilty. The surest way to accomplish that would have been through a plea agreement in which a drug quantity was already established and agreed to; a quantity based on real investigative developments and actual drug seizures rather the convoluted

drug amounts proffered by cooperating witnesses attempting to lower their sentences. Even a modest decrease in drug quantity in this case would have had a tremendous impact. For instance, holding Mr. Smith accountable for 4,999 grams of methamphetamine rather than 5,000 grams, would have reduced his Guidelines range from 188-235 months to 151-188 months.

Again, based on the fact that the legal and factual landscape has been altered by the enactment of the First Step Act, and as a result, Mr. Smith would undoubtedly receive a lesser sentence today than that originally imposed, this Court should find that extraordinary and compelling circumstances exist to warrant a sentence reduction to 120 months.

2. Mr. Smith's Rehabilitation Provides an Additional Extraordinary and Compelling Reason Warranting Relief.

During his nearly six years in custody, Mr. Smith has used his time to transform himself into a responsible citizen. He has completed dozens of educational, vocational, and treatment programs; and has secured employment as well as apprenticeship opportunities while in custody. See Exhibit B.

While rehabilitation, standing alone, may not justify compassionate release, rehabilitation is a salient factor worthy of consideration. As one district court has noted: "Courts exercising that discretion vary on what reasons qualify as 'extraordinary and compelling.' Congress has never defined the term, except to state that '[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reasons.' 28

U.S.C. 994(t). That said, even though it may not be the only factor, rehabilitation is still relevant to determining whether compassionate release is warranted." *United States v. Lopez*, CR 97-01117 ACK-2 (D. Haw. Oct. 7, 2020), Dkt. 351. See also *United States v. Millan*, 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020)("[L]egislators' use of the modifier 'alone' evidences that they believed that rehabilitation is relevant to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction."). Here, Mr. Smith's performance in prison and his efforts towards rehabilitation have been exceptional, particularly in light of his lengthy sentence. First, Mr. Smith's record of prison discipline is excellent; with him having maintained clear conduct -- without a single incident report -- throughout his entire time in the BOP's custody. This is no small feat in the often-violent and drug-infested environment that is a federal prison.

Second, Mr. Smith has been pursuing educational opportunities while incarcerated, having taken over 1,000 hours of educational courses such as Adult Continuing Education (ACE) classes and Pre-Release Preparation programs. In addition, he has 4,500 hours of hands-on and coursework in the Electrical Apprenticeship program, which is accredited through the U.S. Department of Labor. Currently, Mr. Smith is enrolled in the Welding Apprenticeship program at FCI Herlong. Both of these programs have given Mr. Smith the work experience and skills that he will need to successfully obtain a well-paying career upon his release from federal prison. Through the Psychology

Department, Mr. Smith completed the 12-hour drug education program in September 2018 and the 40-hour drug education program (non-RDAP) in November 2018. Furthermore, upon his arrival at FCI Herlong, Mr. Smith sought to better himself by seeking placement in the Residential Drug Abuse Program (RDAP), a 9-month, 500-hour residential drug treatment program. However, due to his distant release date (March 2030), RDAP staff informed him that due to population demands placed on the program he would not be placed in the program until he neared his release date.

Third, Mr. Smith has often received excellent evaluations in his employment as an electrician apprentice (2017- 2021), an orderly in the Safety Department (2021), and as a welding apprentice (current). Each of his supervisors speaking very highly of Mr. Smith and his work ethics.

Fourth, the BOP itself has recognized Mr. Smith's positive transformation while incarcerated, awarding him a custody level of "low." He is currently at a medium security prison due to the fact that travel has been severely curtailed due to the recent COVID-19 outbreak at the prison, from January 2, 2022 to February 14, 2022.

Fifth, Mr. Smith's family and friends, who know him best, all speak of the positive changes that he has made in his nearly six years behind bars, and his dedication as a father, son, and friend to others. See Exhibit C (family/friend letters).

Sixth, as a measure of Mr. Smith's growth, it should be noted that he used the money that he received from his federal stimulus checks to pay off his fines and unpaid motor vehicle tickets so that he would be able to obtain his driver's license upon his

release from prison, which is vital to his successful reentry into the community. On August 3, 2021, Mr. Smith paid $1,159.35 towards seven fines that he had with the Iowa Department of Transportation. See Exhibit D (Receipt of Payments). This is even more remarkable when this Court considers the fact that FCI Herlong is currently awash with drugs, particularly "spice" and fentanyl. These drugs have become so rampant at the facility that the mailroom routinely removes the stamps from incoming mail and photocopies suspicious letters (destroying the original letters and sending inmates only a photocopy of their letters).

In short, the evidence of Mr. Smith's rehabilitation is strong and persuasive. Numerous court have cited precisely this sort of evidence as an extraordinary and compelling reason supporting a sentence reduction under section 3582(c)(1)(A). See *Brooker*, 976 F.3d at 237-38, and *United States v. Quinones*, 2021 U.S. Dist. Lexis 37628, 2021 WL 797835, at *2 (S.D.N.Y. 2021)(citing "substantial evidence of rehabilitation, including a successful prison record, exemplary work history, and countless programming certificates" as evidence of defendant's rehabilitation).

3. The Conditions of Confinement During the COVID-19 Pandemic Present Extraordinary and Compelling Circumstances that Warrant Reduction in Sentence.

Mr. Smith's incarceration over the past two years during the ongoing COVID-19 pandemic is another extraordinary and compelling reason warranting a sentence reduction. Mr. Smith himself unfortunately contracted the virus in December 2020. Mr.

16

Smith and his cellmate contracted the virus and spent approximately 21 days

experiencing severe symptoms, including coughs, hot and cold chills, soreness, painful

muscle aches, and extreme fatigue. Mr. Smith remained in a 5 x 9 cell for 21 days and

essentially nursed himself back to health using medication (cough syrup, aspirin,

cough drops, and ibuprofen) that they had previously purchased from the commissary.

While Mr. Smith's COVID-19 infection was severe, but not enough to warrant a

hospital stay, the effects of the virus on the BOP have been harsh, resulting in lockdowns,

reduced educational programming, and lack of work opportunities. At FCI Herlong,

hundreds of inmates have contracted COVID-19. The BOP has made strong efforts at

vaccinating inmates. However, there have been many inmates who have refused to be

vaccinated; thereby increasing the risk of another outbreak at the facility. Thus, continued

restrictions on inmates' activities, work, and programming at FCI Herlong seems likely to

persist some time into the future. It should be noted that Mr. Smith has acted in a

responsible manner, voluntarily receiving the COVID-19 vaccine to protect himself as

well as other inmates at the prison. A truly selfless act. And Mr. Smith's voluntary

acceptance of the COVID-19 vaccine does not hinder his ability to receive a reduced

sentence. See *United States v. Cavely*, 2021 WL 284383 (N.D. Okla. July 7, 2021)

(granting compassionate release to inmate who received two-dose Pfizer vaccine).

Courts have recognized that harsh conditions of confinement are a valid factor

supporting a shorter custodial sentence. See e.g. Spano, 476 F.3d at 479 (endorsing the

proposition "that the harsher the conditions the shorter the sentence should be"). Indeed,

many courts throughout the country have recognized that the harsh conditions of confinement (rather than COVID-19 itself) during the ongoing COVID-19 pandemic warrant sentence reductions because confinement during COVID-19 is more punitive than originally anticipated. See e.g. *United States v. Indarte*, 2020 U.S. Dist. Lexis 189970, 2020 WL 6060299, at *4 (W.D. Wash. Oct. 14, 2020)("[T]he Court finds that the factor relating to the 'need for just punishment' has dramatically shifted since sentencing. The lock-down measures prisons across the country like FCI Coleman have undergone to mitigate the spread of the pandemic have made confinement much more punitive than was contemplated at sentencing"), and *United States v. Olawoye*, 477 F.Supp.3d 1159, 1165 (D. Ore. Aug. 7, 2020)("The sentence defendant has served has undoubtedly been harsher than the one originally contemplated at the time of sentencing").

The harsh conditions that Mr. Smith has faced are many in number. First, the facility has conducted several total lockdowns, which have, on occasion, lasted for months. The last total lockdown, for example, began on January 2, 2022 and ended on February 14, 2022. During these lockdowns each inmate remains in his assigned two-man cell for 24 hours each day. The only time inmates at FCI Herlong are allowed out of their cells is for supervised, ten minute showers on Mondays, Wednesdays, and Fridays (which themselves are open bays in the common area). They are unable to use the telephones or computers, purchase items from the commissary, or conduct any type of programming activity.

Second, in addition to total lockdowns, FCI Herlong has remained on "modified" lockdown (Level 3 Operations) status since July 1, 2020, due to active staff and prisoner COVID-19 cases, along with other COVID-19 risk factors, including levels of vaccination among staff and prisoners, medical isolation rates at the institution, and/or community transmission rates. See BOP COVID-19 Modified Operations Plan & Matrix. At Level 3 Operations status, programming and services institution-wide are severely restricted. Inmates are allowed to leave their cells, but they generally must remain in their unit's common area where they can showers, use the telephones, and have access to the computers. Meals are eaten in the dining hall (by unit rather than institution-wide), spend between 1 and 3 hours in the recreation yard, and visit the law library for about 1 hour each day (Monday through Friday). And due to limited spacing, other programming activities are seriously curtailed. As an example, the Education Department recently posted a flyer announcing that it would begin accepting applications for participation in one of its vocational trade (VT) programs. However, the flyer also stated that class size would be limited to 12 people (out of approximately 1,300 inmates).

Third, due to its focus on COVID-19, the Health Services Department at FCI Herlong has basically foregone any other type of medical diagnosis or treatment. Inmates who may suffer any type of medical condition or who are on chronic care have experienced long delays in receiving treatment due to COVID-19 and an acute staffing shortage.

FCI Herlong may remain at Level 3 Operations status indefinitely, particularly if

staff and prisoner vaccination rates do not change substantially. According to the BOP

COVID-19 Modified Operations and Matrix, an institution will remain on Level 3

Operations status if the "Facility vaccination rate" remains below 50%, regardless of other

factors. The vaccination rate in Lassen County, where FCI Herlong is located, is 37%.

Assuming the vaccination rate for staff and incarcerated people at FCI Herlong is not

vastly different than the overall county rate, the institution is not poised to move from

Level 3 to Level 2 -- and increase its programming and services -- any time soon, if at all.

Thus, the uniquely harsh prison conditions faced by Mr. Smith during the ongoing

pandemic, coupled with the BOP's failure to protect Mr. Smith from a potentially deadly

virus, constitutes an additional extraordinary and compelling reason which may warrant a

sentence reduction. Judge Rakoff recently granted a sentence reduction under

3582(c)(1)(A) citing exactly this factor as an extraordinary and compelling circumstance,

noting "that the pandemic, because of the concomitant lockdowns and restrictions that are

necessary to ensure inmate safety, has rendered [defendant's] incarceration 'far harsher

and more punitive than the Court had anticipated at sentencing.'" *United States v.*

*Quinones*, 2021 WL 797835, at *2 (quoting *United States v. Rodriguez*, 2020 U.S. Dist.

Lexis 181004, 2020 WL 5810161, at *8 (S.D.N.Y. Sept. 30, 2020)) (granting sentence

reduction to a drug dealer who was sentenced to life in prison under the CCE statute and

who ordered the murder of a confidential informant).

Accordingly, the harsh conditions of confinement during the COVID-19 pandemic

(in addition to possible re-infection from the virus) are another extraordinary and

compelling reason warranting a sentence reduction.

    4. The BOP's Failure to House Mr. Smith Within 500 Miles of his Release Residence Is Yet Another Extraordinary and Compelling Reason for a Reduced Sentence.

For a number of years the BOP had a program statement that encouraged unit team members to seek placement of inmates at facilities near their release residences. But, this program statement was often overlooked or discarded as the BOP sought to balance its own needs and its growing prison population. In 2018, Congress, through the enactment of the First Step Act, directed the BOP to start placing its inmates "within 500 miles" of the inmate's release residence. Studies had shown that inmate recidivism was drastically reduced when inmates were placed closer to home and could remain in contact with their loved ones, particularly physical contact.

When Mr. Smith was initially placed in the custody of the BOP, he was sent to a federal correctional institution in Tucson, Arizona, which was approximately 45 minutes away from his mother who lived in Casa Grande, Arizona. Moreover, Mr. Smith's wife and children subsequently moved to Casa Grande and resided with Mr. Smith's mother so that the family could visit Mr. Smith each weekend. This allowed Mr. Smith to develop stronger bonds with his mother, wife, and his children. The visits also reminded Mr. Smith what was at stake and helped to fortify his desire to better himself.

In early 2018, however, the staff at FCI Tucson informed the inmates at the facility that the mission for that prison had changed; it was to become a gang drop-out facility.

Each of the inmates at the prison were told that they would be transferred. Because his wife and children planned to return to Iowa if he was transferred from Arizona, Mr. Smith sought a transfer to a prison within 500 miles of Ft. Dodge. However, rather than sending Mr. Smith to a prison close to his wife and children, the BOP transferred him to FCI Herlong, in Northern California; about 27 hours away from his wife and children.

Mr. Smith has continuously sought a transfer to be near his family, but has been denied on every occasion. This has had a drastic impact on Mr. Smith's relationship with his wife and children. Without the support of her mother-in-law since moving back to Iowa, Mrs. Smith has tried her best to raise the couple's children on a waitress's paycheck. Then the COVID-19 pandemic hit, and basically wiped out large parts of the restaurant businesses in America, and reduced her paycheck. After nearly four years apart, Mrs. Smith informed Mr. Smith that she was feeling lonely, confused, and overwhelmed as she struggled to support the family in Mr. Smith's absence. After a period of time, his wife delivered the devastating news that she had begun to see another man and had become pregnant. Despite that fact, Mr. Smith still loved his wife and told her that he would do whatever he could to help them work through their problems. They are trying to make the marriage work, but each day that Mr. Smith spends thousands of miles away from his wife and children, is another day closer to disaster. It needed to not have been this way.

Section 3621(b) was amended after the First Step Act to include Congress's directive to the BOP concerning near-release residence placement. That section states, in relevant part:

22

"Place of imprisonment -- The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence." 18 U.S.C. 3621(b).

Mr. Smith is of the belief that had he been allowed to transfer to a facility close to his wife and children much of the terrible events that have occurred over the past four years would not have come to pass. And unfortunately, federal law does not allow Mr. Smith to challenge the BOP's prison designation in federal court. "Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." Id. Therefore, Mr. Smith has lacked an ability to redress his grievance with regards to his prison designation. Moreover, it must be noted that during the prison's monthlong lockdowns Mr. Smith has often gone months and weeks without the opportunity to speak by telephone with his wife and children.

For these reasons, this Court can find that the BOP's failure to place Mr. Smith close to his wife and children, is an extraordinary and compelling reason for a sentence reduction.

5.  Mr. Smith's Disproportionate Sentence Constitutes An Extraordinary and Compelling Reason Warranting Relief.

Section 3553(a)(6) of Title 18 specifically directs district courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records and who have been found guilty of similar conduct." *United States v. Martin*, 455 F.3d 1227, 1231 (11th Cir. 2006). See also *Tapia v. United States*, 564 U.S. 319, 324-25 (2011)(noting that a central concern with the system that preceded the Sentencing Guidelines was that it produced significant sentencing disparities among similarly-situated defendants).

In *United States v. Morefield*, 2021 U.S. Dist. Lexis 74934 (E.D. Wash. Apr. 19, 2021), the defendant, in 2013, was charged with four counts of distribution of heroin and one count of distribution of heroin, resulting in death. The Government filed an 851 notice of intent to seek an enhancement, based on the defendant's two prior drug convictions. The parties stipulated to a plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The district court accepted the plea and subsequently sentenced the defendant to 180 months of imprisonment. After the passage of the First Step Act, the defendant filed a compassionate release motion with the district court, citing among his claims, a sentencing disparity between his sentence and that of his co-defendants. In granting the defendant a time-served sentence, the district court held that:

The Court has always been mindful of the significant sentence

disparities between Defendant and his co-Defendants. The Court is also

mindful that Defendant had a significant role in the heroin distribution in

Ellensburg, Washington, while his co-Defendants may have been heroin

users who were selling much smaller quantities of heroin to support their

habit. That said, the sentencing disparity in this case, where Defendant was

sentenced to 15 years and his co-Defendants were sentenced to 4 months,

is a factor the Court considered in its decision to grant the motion.

Morefield, 2021 U.S. Dist. Lexis 74934, at *11.

As noted by the above case law, section 3553(a)(6) seeks to avoid unwarranted

sentence disparities between similarly-situated defendants. The U.S. Probation Office

indicates, in reference to 18 U.S.C. § 3553(A)(6), that 100% of defendants convicted of

drug trafficking crimes in the Northern District of Iowa receive prison sentences. The

average length of sentence is 116 months. Here, however, Mr. Smith and Messrs. Richard

Kraft, Carl Duckett, William Rees, and Ms. Jessica Duckett were not similarly situated.

Mr. Smith argues that his sentence was disproportionate to that of the

above individuals, all of whom had more culpable roles in the offense and whose conduct

was more severe.

According to the documented and undisputed facts in this case, each of the four

co-defendants named above were a "source" to Mr. Smith, i.e. they supplied him and

others with drugs. Mr. Kraft, for example, was found to be responsible for 3,078 grams

(3.078 kilograms); Mr. Rees responsible for 2,931 grams (2.931 kilograms); and both Carl and Jessica Duckett each responsible for 2,948 grams (2.948 kilograms). Yet, each of these defendants received lesser sentences than Mr. Smith. Mr. Kraft received only a 60 month sentence, Jessica Duckett and William Rees both received 120 month sentences, and Carl Duckett received a 183 month sentence.

In its opposition brief to Mr. Smith's request for a downward departure or variance, the Government did not dispute either the fact that each of the named individuals was Mr. Smith's supplier or that they were more culpable than him. Rather, the Government cited to the fact that each of those defendants had cooperated and had given substantial assistance to the Government. It is a quirk of our federal justice system that the Government offers less time to more culpable defendants solely due to the fact that the Government can prosecute more people using less resources simply by coaxing others to turn on their co-defendants. That is the role of the U.S. Attorney's Office in our criminal justice system and the results in many cases have led to unjust or unreasonable results.

As an example, Mr. Smith points to *United States v. Solomon*, 387 F. App'x 258 (3d Cir. 2010). In that case, one of the defendants (Solomon) ran a drug trafficking organization just outside the city of Pittsburgh. One day he sold drugs to a person who turned out to be a confidential informant. When Solomon learned of the man's duplicity, he sought revenge. He asked his sister's boyfriend (Hanner) to kill the CI's father, to send a message to the CI. Hanner agreed. A couple of nights later, Hanner "knocked on Frank's

door around 10:30 p.m. and shot him three times through the chest and abdomen." Id. at 260. Both men were subsequently indicted and charged with conspiracy to distribute cocaine and using a firearm in furtherance of a drug trafficking crime and causing the death of a person through said firearm. The Government sought the death penalty for both men. However, Hanner agreed to cooperate with the Government against Solomon. Solomon was convicted at trial and given a life sentence. The man who actually pulled the trigger for a payment of "11 ounces of cocaine and $5,000 for murdering Frank Helisek," id. at 260, received a sentence of only 240 months. Thus, in less than ten years a cold-blooded murderer will be released back out into society -- simply because he cooperated with the Government.

This Court, however, need not follow the Government's example. Rather than condemn Mr. Smith for accepting responsibility for his own actions and refusing to drag others through the mud, this Court should instead look at the culpability of each of the defendants in this case and fashion a more equitable sentence for Mr. Smith based on his level of culpability.

C. The Statutory Sentencing Factors Support a Reduction in Sentence.

A reduction in Mr. Smith's sentence to 120 months is consistent with the applicable sentencing factors under Title 18, United States Code, section 3553(a).

First, as noted above, Mr. Smith's post-offense conduct has been excellent. He has stayed out of trouble in prison, maintained strong ties to his family, been an outstanding worker, and pursued educational opportunities. The Ninth Circuit has described a

defendant's post-sentencing rehabilitation as a "critical factor" for district courts to

consider, and this factor strongly militates in favor of a 68-month reduction in sentence.

*United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013)("[P]ost-sentencing or

post-offense rehabilitation -- particularly in light of its tendency to reveal a defendant's

likelihood of future criminal conduct -- [is] a critical factor to consider in the imposition

of a sentence.") (citing *Pepper v. United States*, 562 U.S. 476, 491-93 (2011)). Mr.

Smith's rehabilitation here is all the more commendable because he has made

extraordinary strides while enduring a devastating separation from his wife and children,

who reside in Ft. Dodge while Mr. Smith is housed at FCI Herlong, in northern

California.

Second, in reviewing Mr. Smith's history and characteristics as required by 3553(a),

it becomes obvious that his criminal history is over-represented. As noted in its

"Government's Resistance to Defendant's Motion for Downward Departure and

Variance," filed prior to Mr. Smith's sentence, Mr. Smith had several prior state

convictions. Dkt. # 48. But, as thoroughly discussed in the Factual History section of this

motion, between the ages of 18 and 21 years old (2003 through 2006), when the majority

of his crimes happened, Mr. Smith came under the misguided influence of his mother's

boyfriend, who was himself a drug dealer and user. It was during that time that Mr. Smith

became addicted to methamphetamine. And to earn his supply of drugs, the boyfriend

sent Mr. Smith on various criminal ventures in order to acquire the supplies necessary to

make more methamphetamine. Mr. Smith racked up an array of misdemeanor convictions

during that time and notably, they all occurred 10 to 13 years prior to the instant indictment. And all of them were related to his addiction. Indeed, the record indicates that the two felony drug convictions that the Government threatened to use against Mr. Smith as sentencing enhancements -- possession of anhydrous ammonia with intent to manufacture methamphetamine -- were committed while Mr. Smith was being lead by an older, adult figure who preyed on Mr. Smith's addiction (in fact, he was the person who started Mr. Smith down the path of methamphetamine addiction).

That is not to say that Mr. Smith seeks to absolve himself of his past crimes. Rather, Mr. Smith asks that the Court views these past crimes in their proper context. Mr. Smith was not motivated by profit, but instead, by a need to feed his addiction. The Eighth Circuit has long held that a district court may reduce a defendant's sentence if it finds that a defendant's prior criminal history is overstated. See *United States v. Senior*, 935 F.2d 149 (8th Cir. 1991); see also *United States v. Greger*, 339 F.3d 666 (8th Cir. 2003)(holding that a district court has the authority to depart from the Guidelines to compensate defendant for any over-representation of his criminal history).

Third, a reduction in sentence to 120 months would not pose a danger to public safety. See 18 U.S.C. 3553(a)(2). The BOP itself rates Mr. Smith as a "low" custody inmate. Courts have held that in assessing and balancing the factors under 3553(a) that may support a sentence reduction, district courts must consider the "most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." *Peppers v. United*

*States*, 562 U.S. at 490-493. Thus, even if the district court believed that Mr. Smith posed a danger at the time of sentencing, Mr. Smith's circumstances -- at this time -- demonstrate that he is not a danger to the community.

Fourth, the outpouring of support from Mr. Smith's family and friends forcefully speaks to how Mr. Smith has transformed himself while incarcerated, particularly in light of the fact that Mr. Smith has, for the past four years, been separated from his wife and children by more than a thousand miles -- through no fault of his own or his family.

Fifth, there is a strong correlation between increased age at release from prison and decreased recidivism. See e.g. U.S.S.C., Recidivism Among Federal Violent and Non-Violent Offenders (2019), available at: https://www. ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/20192019 0124_Recidivism_Violence.pdf (last accessed Dec. 21, 2021). According to the Sentencing Commission's data, people in Mr. Smith's cohort -- white males in their mid-to-late 30s at the time of their release from federal prison -- have a re-incarceration rate of 15.7%. Id. at 61. Rearrest, Reconviction, and Reincarceration Rates Across Selected Variables (Non Violent Offenders). Given the continuous family support, his release plan, and strong evidence of his rehabilitation over the past years, Mr. Smith is unlikely to be among the 15.7% who are reincarcerated.

Finally, to assuage any concerns that Mr. Smith poses a danger to the community, the district court can simply impose a term of supervised release upon Mr. Smith's return. Concerns with reducing a sentence may be significantly offset by the district court's

30

discretion to convert unserved imprisonment to supervised release, with or without home confinement. Supervised release also mitigates any concern that release risks recidivism. The district court, in *United States v. Galu*, recognized this point: "In considering Galu's potential rehabilitation, this court will be able to keep an eye on Galu to ensure that he continues to work towards his rehabilitation. If Galu does violate the terms of his release, this court can quickly intervene." *United States v. Galu*, 2020 WL 5521034, at \*4 (D. Haw. Sept. 14, 2020). This ability to convert unserved time to supervised release, ensures adequate oversight and mitigates any risks of community danger. And, it is worth noting granting Mr. Smith's motion will not amount to a time-served sentence or immediate release. His projected release date will simply be moved forward from March 26, 2030 to March 26, 2025. This new release date would allow him to participate in the BOP's RDAP before he is released.

In sum, the section 3553(a) factors support a sentence reduction.

## V.   CONCLUSION

For the above reasons, in the interest of justice and fairness, Andrew Smith respectfully asks that this Court take another look at his sentence and adjust it to 120 months under the principles of equity, justice, and fairness.

Respectfully submitted,

Andrew Cole Smith

CERTIFICATE OF SERVICE

I, Andrew Cole Smith, hereby certify that a true and accurate copy of the foregoing Motion for Compassionate Release has been sent on this day through the U.S. Mail, postage pre-paid, to:

Ajay J. Alexander, AUSA
U.S. Attorney's Office
600 Fourth Street, Suite 670
Sioux City, IA 51101

Executed on this 12ᵗʰ day of Oct 2022 at Herlong, California.

Andrew Cole Smith
Reg. No. 16882-029
Federal Correctional Institution
P.O.Box 800
Herlong, CA 96113

March 21, 2022

Andrew Cole Smith
Reg. No. 16882-029
Federal Correctional Institution
P.O. Box 800
Herlong, CA 96113

The Honorable U.S. District Judge
United States District Courthouse
320 6th Street
Sioux City, IA 51101

RE: *United States v. Smith*, 3:16-cr-03048-MWB

Your Honor:

I am by no means an innocent bystander in the charges against me. I have made many mistakes in my life. When I appeared for sentencing before the Honorable Mark W. Bennett on August 2, 2017 and asked for a downward departure or variance, Judge Bennett seemed willing to give me a lower sentence, if I could provide a reason for such a below the Guidelines sentence. In court that day he specifically asked me to give him a good reason to grant my motion for a downward departure or variance. At that moment, I was unprepared to answer that question. I had become completely overwhelmed by the whole proceeding and the prospect of spending between 16 to 20 years in prison. No suitable answer came to me that day. I basically said that "I'm not a bad person." Thereafter, Judge Bennett remarked that as much as he considered granting my motion, he kept coming back to all the opportunities that I had squandered, such as drug treatment programs. Looking back now, I have to completely agree with Judge Bennett. It is true, I have had various opportunities in the past to change my life for the better. However, I have always allowed my addiction to control my life and cloud my decision-making ability and judgment.

I truly believe that one of the best things that happened to me at that time was for me to get away from the negative environment that had been such a terrible influence on my life. Prior to my sentencing in federal court I cannot recall a time when I was sober for any prolonged period of time. I had nothing going for me at that point, except a loving family that I did not properly cherish or value. And given that I have never had any type of job skill or education to start a career, a lenient sentence at that point would have undoubtedly pushed me right back into the clutches of my addiction.

Instead, I was sent to federal prison with the daunting realization that I would have to spend the next 15 years or so of my life away from the people who have truly stood by me and loved me, despite my many setbacks. It was there that I took the judge's words to heart. After a period of self-realization, I recognized that I had wasted numerous opportunities in the past. I vowed to do better. To that end, I have taken advantage of every opportunity that the BOP has offered. I have been in federal prison for almost 6 years and have been incident free. I have been clean and sober

since November of 2016 and have passed random urinalysis and breathalyzer tests. Through cognitive skills training and the completion of two drug abuse programs -- a 12-hour program and a 40-hour (non-RDAP) program, I have learned how to effectively combat my addiction. I plan to complete RDAP, a 9-month, 500-hour residential drug treatment program, prior to my release from prison.

To address my lack of job skills and plan for a well-paying job to help support my family, I enrolled in an Electrician apprenticeship program. I have logged over 4,500 hours through this apprenticeship program, which is certified by the U.S. Department of Labor, and will become a journeyman within the next two years. In addition, I have earned more than 60 certificates as well as over 1,000 hours of Adult Continuing Education programming. But I have not rested on my laurels. I am presently taking the Welding apprenticeship program offered at FCI Herlong, which is also certified by the U.S. Department of Labor, and have already become AWS (American Welding Society) Qualified.

One of the classes that I have found to be most beneficial is "Parenting from a Distance." This program has allowed me to cope with the dreaded question that children of incarcerated parents seem to always ask: "Daddy, when are you coming home?" It is a question that repeatedly breaks my heart. Those moments are, by far, the hardest moments of my life, particularly now that the BOP has placed me in a prison thousands of miles away from my wife and children. When I was arrested, my four children were aged 11, 6, 2 and 1 years old. As you can imagine, I have missed a major portion of their development years as well as important events in their young lives. Indeed, my oldest -- now 17 years old -- is already talking about college. The lack of physical contact between my wife, my children and myself has been tough these past four years. Yet that has driven me even harder to do everything in my power to return home to them as soon as possible. In the interim I have striven to lower my custody level, which has been "low" since 2019 -- though the BOP has kept me at a medium security prison despite my low custody level -- in hopes that I can be moved to a facility within 500 miles of my wife and children.

If I were to stand before Your Honor today and you asked me why my sentence should be reduced, I am confident that I could answer that question in a truthful and heartfelt way that would encourage this Court to grant my request. I have four guiding questions that I ask myself often: (1) Have I demonstrated a willingness to change and do the right thing? (2) Am I a risk to myself or the community? (3) Have I done sufficient amount of time to promote respect for the law and deter me from future crimes? (4) Have I learned a job skill that will allow me to gain employment that will allow me to take care of myself and my family?

I write this letter to you now, Your Honor, because I truly believe that I can answer each of these questions in a positive light. For example, I have demonstrated a willingness to change and do the right thing. My prison record supports this contention. But what the record does not show is that this prison is awash with drugs. I could have easily fallen back into my old ways, especially after I got my federal stimulus checks. However, rather than travel down that destructive path, I used that money to pay off some of the fines that I had outstanding with the Iowa Department of

2

Transportation. This will aid me in my efforts to obtain my driver's license when I am released. I am not a risk to myself or the community. I have never been a violent person and as I stated above, in this prison community, I have not sought to use or sell drugs to my fellow inmates, though those opportunities are readily available. I have completed nearly six years of my sentence. Nevertheless, I do not seek immediate release. Rather, I believe that a sentence reduction to 120 months would be sufficient to promote respect for the law. Ten years is an incredibly long time, especially when those years are spent away from one's growing children. Further, the unserved portion of my sentence could be added to my term of supervised release. The job market for electricians has never been better as the construction boom in this country continues forward. My years of hands-on training, coupled with my classroom instruction, will allow me to leave prison and enter the workforce immediately, at a high-level of pay. But that is not all, I am currently enrolled in a welding program as well. Thus, I will have two outstanding job options available to me. A prospect that I did not realize prior to my incarceration. And undergirding all of my efforts, is my overwhelming desire to return to my wife and children; to give them the love and support that they have shown to me throughout the years.

Therefore, Your Honor, I am respectfully asking that you grant me compassion, and reduce my sentence to 120 months.

Sincerely,

Andrew Cole Smith

ANDREW COLE SMITH
Reg. No. 16882-029
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 800
HERLONG, CA 96113

( 1 o 2 )



10/13/22 VA

RENO, NV PBMC 0935
PM 13 OCT 2022

TO: CLERK OF COURT
U.S. DISTRICT COURT
320 6ᵀᴴ STREET
SIOUX CITY, IA 51D

RECEIVED

OCT 17 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

# EXHIBIT A

EMAIL TO WARDEN

NO RESPONSE AS OF 3/22/2022

-----------------------------------------------------------------------------------------------

FROM: 16882029
TO: Warden
SUBJECT: ***Request to Staff*** SMITH, ANDREW, Reg# 16882029, HER-S-C
DATE: 11/19/2021 07:37:22 PM

To: Warden Thompson
Inmate Work Assignment: n/a

Hello,
This is a compassionate release/reduction in sentence request. I am asking you to please file a compassionate release/RIS
motion to the court on my behalf because I believe extraordinary and compelling reaons exist, including lengthy sentence,
change in law, overstated criminal history, rehabilitative efforts, family circumstances and conditions of confinement due to the
pandemic.
Thank you

*No response as of 3-22-22*



UNICOR FEDERAL PRISON INDUSTRIES, INC.
LEAVENWORTH, KANSAS

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

# REQUEST FOR ADMINISTRATIVE REMEDY

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: **Smith, Andrew C.**    **16882-029**    **Sierra**    **FCI Herlong**
     LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A- INMATE REQUEST**

I've emailed a compassionate release / reduction in sentence request to the warden on Nov. 19, 2021. However, I still have not received a response yet as four months has surpassed already, Therefore I am asking again to please file a Compassionate Release / Reduction In Sentence motion to the Court on my behalf because I believe extraordinary and compelling reasons exist, including my disproportionately lengthy sentence, change in law due to First Step Act's heightened requirement for enhancing drug sentences, exceptional rehabilitative efforts, family circumstances, conditions of confinement due to the pandemic, over stated criminal history and BOP's failure to house me within 500 miles of my release residence.

3-23-22
DATE

SIGNATURE OF REQUESTER

**Part B- RESPONSE**

_____
DATE

_____
WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE         CASE NUMBER: _____

CASE NUMBER: _____

**Part C- RECEIPT**

# EXHIBIT B

## CURRENT TEAM REVIEW

## PROGRESS REPORT FROM 4/29/2022

## DEPT. OF LABOR APPRENTICESHIP ENROLLMENT AND HOURS FOR WELDING AND ELECTRICAL

**Individualized Needs Plan - Program Review    (Inmate Copy)**     SEQUENCE: 02071011
Dept. of Justice / Federal Bureau of Prisons     Team Date: 07-14-2022
Plan is for inmate: SMITH, ANDREW COLE  16882-029



| Facility: | HER HERLONG FCI | Proj. Rel. Date: | 03-26-2030 |
|---|---|---|---|
| Name: | SMITH, ANDREW COLE | Proj. Rel. Mthd: | GOOD CONDUCT TIME |
| Register No.: | 16882-029 | DNA Status: | TCN06996 / 09-08-2017 |
| Age: | 37 | | |
| Date of Birth: | 02-12-1985 | | |

**Detainers**

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| HER | VT WELDING | VT WELDING | 02-24-2022 |

**Current Education Information**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| HER | ESL HAS | ENGLISH PROFICIENT | 09-06-2017 |
| HER | GED HAS | COMPLETED GED OR HS DIPLOMA | 09-06-2017 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| HER | | APPRENTICESHIP WELDING | 04-01-2022 | CURRENT |
| HER | C | DIST LA1 | 04-11-2022 | 04-15-2022 |
| HER | C | DIST WRIT2 | 05-02-2022 | 05-06-2022 |
| HER | C | RESUME WRITING 101 (RPP 2) | 05-09-2022 | 05-09-2022 |
| HER | C | DIST MATH1 | 05-09-2022 | 05-13-2022 |
| HER | C | DIST THINK | 05-16-2022 | 05-20-2022 |
| HER | C | DIST MATH2 | 05-03-2022 | 05-10-2022 |
| HER | C | DIST SS1 | 04-11-2022 | 04-15-2022 |
| HER | C | ACE TIME MANAGEMENT (RPP 6) | 03-07-2022 | 03-07-2022 |
| HER | C | RESUME WRITING 101 (RPP 2) | 02-28-2022 | 02-28-2022 |
| HER | C | SUN SMART-I/M MODEL PROGRAM | 02-20-2022 | 03-13-2022 |
| HER | C | ACE MANNERS FOR MEN (RPP 6) | 12-01-2021 | 12-01-2021 |
| HER | C | ACE JOB INTERVIEWING (RPP 2) | 12-06-2021 | 12-06-2021 |
| HER | C | ACE DRESS FOR SUCCESS (RPP 6) | 11-15-2021 | 11-15-2021 |
| HER | C | ACE NUTRITION & MEALS (RPP 1) | 12-13-2021 | 12-13-2021 |
| HER | C | ACE INTRO TO BUDGETING (RPP 3) | 12-01-2021 | 12-01-2021 |
| HER | C | ACE BUSINESS ETIQUETTE | 11-01-2021 | 11-01-2021 |
| HER | C | CREDIT EVAL AND REPAIR (RPP 3) | 11-08-2021 | 11-08-2021 |
| HER | C | RECREATION AIDE PROGRAM (RPP6) | 04-05-2021 | 06-13-2021 |
| HER | P | APPRENTICESHIP/ELECTRICAL | 11-01-2019 | 04-15-2021 |
| HER | C | DIST LA1 | 08-26-2020 | 09-02-2020 |
| HER | C | DIST THINK | 08-19-2020 | 08-26-2020 |
| HER | C | DIST LA2 | 08-12-2020 | 08-19-2020 |
| HER | C | DISTANCE INFO | 08-05-2020 | 08-12-2020 |
| HER | C | DIST SS1 | 07-29-2020 | 08-05-2020 |
| HER | C | DIST SS2 | 07-22-2020 | 07-29-2020 |
| HER | C | DIST SCI1 | 07-15-2020 | 07-22-2020 |
| HER | C | DIST SCI2 | 07-08-2020 | 07-15-2020 |
| HER | C | DIST MATH1 | 07-01-2020 | 07-08-2020 |
| HER | C | FACTS AND RESPONSE CLASS | 07-22-2020 | 07-27-2020 |
| HER | C | PARENTING FROM A DISTANCE-RPP6 | 06-08-2020 | 06-19-2020 |
| HER | C | DIST WRIT1 | 06-17-2020 | 06-24-2020 |
| HER | C | DIST MATH2 | 06-10-2020 | 06-17-2020 |
| TCN | P | ELECTRICAL APPRENTICESHIP | 11-20-2017 | 08-14-2019 |
| TCN | C | CULTURAL TABOO II, ACE DVD | 04-29-2019 | 05-27-2019 |
| TCN | C | ULTIMATE FACTORIES | 04-24-2019 | 05-29-2019 |
| TCN | C | UFO SYNDROME | 04-23-2019 | 05-21-2019 |



**Individualized Needs Plan - Program Review    (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SMITH, ANDREW COLE  16882-029

SEQUENCE: 02071011
Team Date: 07-14-2022

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| TCN | C | MUSIC GREATS | 04-22-2019 | 05-22-2019 |
| TCN | C | UNIVERSE | 02-19-2019 | 04-09-2019 |
| TCN | C | CLASH OF GODS, ACE DVD | 02-13-2019 | 03-06-2019 |
| TCN | C | HOW IT'S MADE DVD SERIES ACE | 02-13-2019 | 03-07-2019 |
| TCN | C | EXTRAORDINARY ANIMALS PART II | 02-13-2019 | 03-13-2019 |
| TCN | C | UNIVERSE | 10-01-2018 | 11-16-2018 |
| TCN | C | RIVER MONSTERS | 10-01-2018 | 11-16-2018 |
| TCN | C | BIZARRE FOODS IV - DVD ACE | 10-01-2018 | 11-16-2018 |
| TCN | C | 10 DAYS THAT CHANGED AMERICA | 10-01-2018 | 11-16-2018 |
| TCN | C | WORLD RELIGIONS ACE | 08-03-2018 | 09-28-2018 |
| TCN | C | ENGINEERING DISASTERS | 08-03-2018 | 09-28-2018 |
| TCN | C | AFRICAN ANIMAL PREDATORS ACE | 08-03-2018 | 09-28-2018 |
| TCN | C | CREATURES OF DEEP, ACE DVD | 08-03-2018 | 09-28-2018 |
| TCN | C | ARCHITECTURAL WONDERS ACE | 08-03-2018 | 09-28-2018 |
| TCN | C | HECHO EN MEXICO: ACE CLASS | 06-18-2018 | 07-06-2018 |
| TCN | C | HOW EARTH WAS MADE PART II ACE | 06-14-2018 | 07-06-2018 |
| TCN | C | EXTRAORDINARY ANIMALS DVD ACE | 06-18-2018 | 07-06-2018 |
| TCN | C | BASKESTBALL'S LEGEND ACE DVD | 06-14-2018 | 07-06-2018 |
| TCN | C | BASIC NUTRITION - RPP1-HN | 04-18-2018 | 05-09-2018 |
| TCN | C | INSIDE THE HUMAN BODY ACE | 04-18-2018 | 05-09-2018 |
| TCN | C | INMATE WELLNESS CLASS | 02-17-2018 | 05-17-2018 |
| TCN | C | MID EAST CULTURE/HIST ACE DVD | 04-18-2018 | 05-09-2018 |
| TCN | C | SPORTS CONDITIONING CLASS | 02-25-2018 | 04-20-2018 |
| TCN | C | GREAT SPEECHES | 11-30-2017 | 01-12-2018 |
| TCN | C | THE MIGHTY MISSISSIPPI | 11-29-2017 | 01-08-2018 |
| TCN | C | ENRON: THE SMARTEST GUYS | 11-28-2017 | 12-28-2017 |
| TCN | C | DOMES: BUILDING BIG DOMES | 11-27-2017 | 12-22-2017 |
| TCN | C | MODERN MARVELS II | 10-19-2017 | 11-27-2017 |
| TCN | C | MODERN MARVELS I | 10-12-2017 | 11-24-2017 |

**Discipline History (Last 6 months)**

| Hearing Date | Prohibited Acts |
|--------------|-----------------|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

**Current Care Assignments**

| Assignment | Description | Start |
|------------|-------------|-------|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 09-27-2017 |
| CARE1-MH | CARE1-MENTAL HEALTH | 09-12-2017 |

**Current Medical Duty Status Assignments**

| Assignment | Description | Start |
|------------|-------------|-------|
| C19-T PEND | COVID-19 TEST-PENDING RESULTS | 09-23-2021 |
| NO PAPER | NO PAPER MEDICAL RECORD | 09-18-2017 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 09-18-2017 |
| YES F/S | CLEARED FOR FOOD SERVICE | 09-18-2017 |

**Current Drug Assignments**

| Assignment | Description | Start |
|------------|-------------|-------|
| DAP NO INT | DRUG ABUSE PROGRAM NO INTEREST | 05-05-2021 |
| ED COMP | DRUG EDUCATION COMPLETE | 09-04-2018 |
| NR COMP | NRES DRUG TMT/COMPLETE | 11-08-2018 |

**FRP Payment Plan**

| Most Recent Payment Plan |
|--------------------------|

**FRP Assignment:      COMPLT      FINANC RESP-COMPLETED      Start: 10-02-2017**

Inmate Decision:  **AGREED**      **$25.00**      Frequency:  **QUARTERLY**
Payments past 6 months:      **$0.00**      Obligation Balance: **$0.00**


| Most Recent Payment Plan |
|---|

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*\*\* NO ADJUSTMENTS MADE IN LAST 6 MONTHS \*\**

**FRP Deposits**

Trust Fund Deposits - Past 6 months:   $1,199.72      Payments commensurate ?   Y

New Payment Plan:   \*\* No data \*\*

**Current FSA Assignments**

| Assignment | Description | Start |
|---|---|---|
| FTC ELIG | FTC-ELIGIBLE - REVIEWED | 01-19-2022 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 07-12-2022 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 07-12-2022 |
| N-COGNTV Y | NEED - COGNITIONS YES | 07-12-2022 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-30-2021 |
| N-EDUC N | NEED - EDUCATION NO | 07-12-2022 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 07-12-2022 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 07-12-2022 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 07-12-2022 |
| N-MEDICL N | NEED - MEDICAL NO | 07-12-2022 |
| N-RLF N | NEED - REC/LEISURE/FITNESS NO | 07-12-2022 |
| N-SUB AB Y | NEED - SUBSTANCE ABUSE YES | 07-12-2022 |
| N-TRAUMA Y | NEED - TRAUMA YES | 07-12-2022 |
| N-WORK Y | NEED - WORK YES | 07-12-2022 |
| R-MED | MEDIUM RISK RECIDIVISM LEVEL | 07-12-2022 |

**Progress since last review**

| You have completed 10 programs since your last review and are currently participating in one additional program. |
|---|

**Next Program Review Goals**

| Enroll in at least two distance or ACE classes by your next review. |
|---|

**Long Term Goals**

| Complete Resolve Workshop and at least four distance or ACE classes by July 2023. |
|---|

**RRC/HC Placement**

|  |
|---|

**Comments**

| You will be reviewed for RRC placement/ Home Detention consideration in accordance with the 2nd Chance Act of 2007 and the 5-Factor Criteria in 18 USC 3621(b). Your review will be conducted 17-19 months prior to your release. Notify your Case Manager if your release address/plans change via Inmate Request to Staff form.<br>Resolve any possible warrant or detainers and report any possible pending charges the Bureau of Prisons may not be aware of. If the Bureau of Prisons becomes of aware of any pending charges, it will negatively affect your halfway house process. Inmates with pending charges or detainers cannot receive any halfway house placement until these issues are resolved. |
|---|

**Summary Reentry Plan - <mark>Progress Report</mark>**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SMITH, ANDREW COLE  16882-029

SEQUENCE: 00302409
Report Date: <mark>04-28-2022</mark>



| | |
|---|---|
| Facility: | HER HERLONG FCI |
| Name: | SMITH, ANDREW COLE |
| Register No.: | 16882-029 |
| Quarters: | S03-512L |
| Age: | 37 |
| Date of Birth: | 02-12-1985 |

| | |
|---|---|
| Custody Level: | IN |
| Security Level: | <mark>LOW</mark> |
| Proj. Rel Date: | 03-26-2030 |
| Release Method: | GOOD |
| DNA Status: | TCN06996 / 09-08-2017 |

## Contact Information
**Release contact & address**
Dannette Smith, WIFE
~~15661 W. Impala Dr., Casa Grande, AZ 85122 US~~    *29062 Mahogany Dedham, IA 51440*

phone (home) : 520-431-7979

## Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 21:841(A)(1),841(B)(1)(A), AND 846 CONSPIRACY TO DISTRIBUTE 500 GRAMS OR MOE OF A MIXTURE OR SUBSTANCE CONTAINING A DETECTABLE AMOUNT OF METHAMPHETAMINE WHICH CONTAINED 50 GRAMS OR MORE OF ACTUAL (PURE) METHAMPHETAMINE(CT.1) | 188 MONTHS |

Date Sentence Computation Began:    08-02-2017
Sentencing District:    IOWA, NORTHERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit  - InOp Time |
|---|---|---|---|
| 0 /    0 /    0 | 270 | Years: 5 Months: 5 Days: 10 | + 257    JC  - 0    InOp |

## Detainers

| Detaining Agency | Remarks |
|---|---|
| *NO DETAINER* | |

## Program Plans

Smith arrived at FCI Herlong on September 5, 2019, as a transfer.  He has been encouraged to participate in programs and obtain employment during his incarceration.

## Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|
| FTC ELIG | FTC-ELIGIBLE - REVIEWED | 01-19-2022 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 01-14-2022 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 01-14-2022 |
| N-COGNTV Y | NEED - COGNITIONS YES | 01-14-2022 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-30-2021 |
| N-EDUC N | NEED - EDUCATION NO | 01-14-2022 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 01-14-2022 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 01-14-2022 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 01-14-2022 |
| N-MEDICL N | NEED - MEDICAL NO | 01-14-2022 |
| N-RLF N | NEED - REC/LEISURE/FITNESS NO | 01-14-2022 |
| N-SUB AB Y | NEED - SUBSTANCE ABUSE YES | 01-14-2022 |
| N-TRAUMA Y | NEED - TRAUMA YES | 01-14-2022 |
| N-WORK Y | NEED - WORK YES | 01-14-2022 |
| R-HI | HIGH RISK RECIDIVISM LEVEL | 01-14-2022 |

## FSA Comments

Smith has a high risk of recidivism and has been assessed to have needs in the following areas: Cognitions, Substance Abuse, Trauma, and Work.

## Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SMITH, ANDREW COLE  16882-029

SEQUENCE: 00302409
Report Date: 04-28-2022

| Facl | Assignment | Description | Start |
|------|-----------|-------------|-------|
| HER | VT WELDING | VT WELDING | 02-24-2022 |

**Work Assignment Summary**

Smith has held multiple periods of employment during his incarceration. While employed, he received on-the-job training and satisfactory work evaluations.

**Current Education Information**

| Facl | Assignment | Description | Start |
|------|-----------|-------------|-------|
| HER | ESL HAS | ENGLISH PROFICIENT | 09-06-2017 |
| HER | GED HAS | COMPLETED GED OR HS DIPLOMA | 09-06-2017 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| HER | | APPRENTICESHIP WELDING | 04-01-2022 | CURRENT |
| HER | C | ACE TIME MANAGEMENT (RPP 6) | 03-07-2022 | 03-07-2022 |
| HER | C | RESUME WRITING 101 (RPP 2) | 02-28-2022 | 02-28-2022 |
| HER | C | SUN SMART-I/M MODEL PROGRAM | 02-20-2022 | 03-13-2022 |
| HER | C | ACE MANNERS FOR MEN (RPP 6) | 12-01-2021 | 12-01-2021 |
| HER | C | ACE JOB INTERVIEWING (RPP 2) | 12-06-2021 | 12-06-2021 |
| HER | C | ACE DRESS FOR SUCCESS (RPP 6) | 11-15-2021 | 11-15-2021 |
| HER | C | ACE NUTRITION & MEALS (RPP 1) | 12-13-2021 | 12-13-2021 |
| HER | C | ACE INTRO TO BUDGETING (RPP 3) | 12-01-2021 | 12-01-2021 |
| HER | C | ACE BUSINESS ETIQUETTE | 11-01-2021 | 11-01-2021 |
| HER | C | CREDIT EVAL AND REPAIR (RPP 3) | 11-08-2021 | 11-08-2021 |
| HER | C | RECREATION AIDE PROGRAM (RPP6) | 04-05-2021 | 06-13-2021 |
| HER | P | APPRENTICESHIP/ELECTRICAL | 11-01-2019 | 04-15-2021 |
| HER | C | DIST LA1 | 08-26-2020 | 09-02-2020 |
| HER | C | DIST THINK | 08-19-2020 | 08-26-2020 |
| HER | C | DIST LA2 | 08-12-2020 | 08-19-2020 |
| HER | C | DISTANCE INFO | 08-05-2020 | 08-12-2020 |
| HER | C | DIST SS1 | 07-29-2020 | 08-05-2020 |
| HER | C | DIST SS2 | 07-22-2020 | 07-29-2020 |
| HER | C | DIST SCI1 | 07-15-2020 | 07-22-2020 |
| HER | C | DIST SCI2 | 07-08-2020 | 07-15-2020 |
| HER | C | DIST MATH1 | 07-01-2020 | 07-08-2020 |
| HER | C | FACTS AND RESPONSE CLASS | 07-22-2020 | 07-27-2020 |
| HER | C | PARENTING FROM A DISTANCE-RPP6 | 06-08-2020 | 06-19-2020 |
| HER | C | DIST WRIT1 | 06-17-2020 | 06-24-2020 |
| HER | C | DIST MATH2 | 06-10-2020 | 06-17-2020 |
| TCN | P | ELECTRICAL APPRENTICESHIP | 11-20-2017 | 08-14-2019 |
| TCN | C | CULTURAL TABOO II, ACE DVD | 04-29-2019 | 05-27-2019 |
| TCN | C | ULTIMATE FACTORIES | 04-24-2019 | 05-29-2019 |
| TCN | C | UFO SYNDROME | 04-23-2019 | 05-21-2019 |
| TCN | C | MUSIC GREATS | 04-22-2019 | 05-22-2019 |
| TCN | C | UNIVERSE | 02-19-2019 | 04-09-2019 |
| TCN | C | CLASH OF GODS, ACE DVD | 02-13-2019 | 03-06-2019 |
| TCN | C | HOW IT'S MADE DVD SERIES ACE | 02-13-2019 | 03-07-2019 |
| TCN | C | EXTRAORDINARY ANIMALS PART II | 02-13-2019 | 03-13-2019 |
| TCN | C | UNIVERSE | 10-01-2018 | 11-16-2018 |
| TCN | C | RIVER MONSTERS | 10-01-2018 | 11-16-2018 |
| TCN | C | BIZARRE FOODS IV - DVD ACE | 10-01-2018 | 11-16-2018 |
| TCN | C | 10 DAYS THAT CHANGED AMERICA | 10-01-2018 | 11-16-2018 |
| TCN | C | WORLD RELIGIONS ACE | 08-03-2018 | 09-28-2018 |
| TCN | C | ENGINEERING DISASTERS | 08-03-2018 | 09-28-2018 |
| TCN | C | AFRICAN ANIMAL PREDATORS ACE | 08-03-2018 | 09-28-2018 |
| TCN | C | CREATURES OF DEEP, ACE DVD | 08-03-2018 | 09-28-2018 |
| TCN | C | ARCHITECTURAL WONDERS ACE | 08-03-2018 | 09-28-2018 |


| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| TCN | C | HECHO EN MEXICO: ACE CLASS | 06-18-2018 | 07-06-2018 |
| TCN | C | HOW EARTH WAS MADE PART II ACE | 06-14-2018 | 07-06-2018 |
| TCN | C | EXTRAORDINARY ANIMALS DVD ACE | 06-18-2018 | 07-06-2018 |
| TCN | C | BASKETBALL'S LEGEND ACE DVD | 06-14-2018 | 07-06-2018 |
| TCN | C | BASIC NUTRITION - RPP1-HN | 04-18-2018 | 05-09-2018 |
| TCN | C | INSIDE THE HUMAN BODY ACE | 04-18-2018 | 05-09-2018 |
| TCN | C | INMATE WELLNESS CLASS | 02-17-2018 | 05-17-2018 |
| TCN | C | MID EAST CULTURE/HIST ACE DVD | 04-18-2018 | 05-09-2018 |
| TCN | C | SPORTS CONDITIONING CLASS | 02-25-2018 | 04-20-2018 |
| TCN | C | GREAT SPEECHES | 11-30-2017 | 01-12-2018 |
| TCN | C | THE MIGHTY MISSISSIPPI | 11-29-2017 | 01-08-2018 |
| TCN | C | ENRON: THE SMARTEST GUYS | 11-28-2017 | 12-28-2017 |
| TCN | C | DOMES: BUILDING BIG DOMES | 11-27-2017 | 12-22-2017 |
| TCN | C | MODERN MARVELS II | 10-19-2017 | 11-27-2017 |
| TCN | C | MODERN MARVELS I | 10-12-2017 | 11-24-2017 |

## Education Information Summary

Smith has completed 58 programs during his incarceration and is currently participating in the Welding Apprenticeship program.

## Discipline Reports

| Hearing Date | Prohibited Acts |
|--------------|-----------------|

*\*\* NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS \*\**

## Discipline Summary

Smith has maintained clear conduct throughout his incarceration.

## ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|------|-----------|--------|-------|------|
| HER | A-DES | TRANSFER RECEIVED | 09-05-2019 | CURRENT |
| TCN | A-DES | US DISTRICT COURT COMMITMENT | 09-06-2017 | 08-05-2019 |

## Current Care Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 09-27-2017 |
| CARE1-MH | CARE1-MENTAL HEALTH | 09-12-2017 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| C19-T PEND | COVID-19 TEST-PENDING RESULTS | 09-23-2021 |
| NO PAPER | NO PAPER MEDICAL RECORD | 09-18-2017 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 09-18-2017 |
| YES F/S | CLEARED FOR FOOD SERVICE | 09-18-2017 |

## Current PTP Assignments

| Assignment | Description | Start |
|------------|-------------|-------|

*NO ASSIGNMENTS*

## Current Drug Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| DAP NO INT | DRUG ABUSE PROGRAM NO INTEREST | 05-05-2021 |
| ED COMP | DRUG EDUCATION COMPLETE | 09-04-2018 |
| NR COMP | NRES DRUG TMT/COMPLETE | 11-08-2018 |

## Physical and Mental Health Summary

Smith is considered a healthy or simple chronic care inmate. He appears to maintain a sanitary physical appearance and living quarters.

## FRP Payment Plan



## Summary Reentry Plan - Progress Report
### Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SMITH, ANDREW COLE 16882-029

**SEQUENCE: 00302409**
**Report Date: 04-28-2022**

| Most Recent Payment Plan |
|---|

**FRP Assignment:**     COMPLT    **FINANC RESP-COMPLETED**     **Start: 10-02-2017**

**Inmate Decision:**    **AGREED**     **$25.00**       **Frequency: QUARTERLY**
**Payments past 6 months:**    **$0.00**       **Obligation Balance: $0.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

### Financial Responsibility Summary

| Smith has completed his financial obligation. |
|---|

### Release Planning

| If granted clemency, Smith plans to reside with his wife, Dannette Smith, in Casa Grande, Arizona, upon his release. |
|---|

### General Comments

| ** No notes entered ** |
|---|



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SMITH, ANDREW COLE 16882-029

SEQUENCE: 00302409
Report Date: 04-28-2022

Name: SMITH, ANDREW COLE
Register Num: 16882-029
Age: 37
Date of Birth: 02-12-1985
DNA Status: TCN06996 / 09-08-2017

Inmate (SMITH, ANDREW COLE, Register Num: 16882-029)

4/09/00
Date

Chairperson

4/09/00
Date

Case Manager

4/09/00
Date

# ZA2022052506 - Smith, Andrew Cole

Home > Programs > 2018-ZA-71003 > Apprentices > ZA2022052506

*This apprentice has a registration pending action and cannot be updated until it is approved.*

## Current Status

**Status**
Registration Pending
Last Updated by r2rodriguez@bop.gov on 5/2/2022 11:26 AM EDT

## Program

**Sponsor**
Federal Bureau of Prisons (BOP) - 2018-ZA-71003

**Sponsor Program Number**
2018-ZA-71003

## Important Dates

**Registration Date**
May 2, 2022

**Expected Completion Date**
Mar 18, 2025

**Date Apprenticeship Began** ⓘ
Mar 18, 2022

## Apprentice's Information

**First Name**
Andrew

**Middle Name**
Cole

**Last Name**
Smith

**Suffix**

**Address** *
P.O. Box 900

**City** *
Herlong

**State**
CA

**Zip Code** *
96113

**Telephone**
(530) 827-8360

**Email**

**Social Security Number** ⓘ
***-**-2090

**Date of Birth**
Feb 12, 1985

**Sex**
Male

**Employment Status**
New Employee

**Did the apprentice complete a pre-apprenticeship program prior to their registration in this apprenticeship program?**
No

**Employer**

HERLONG FCI - 2018-ZA-71003-007140

## Apprentice Demographics

**Hispanic/Latino Ethnicity**
Non-Hispanic

**Veteran Status**
Non Veteran

**Race**

White

**Education Level**

High School graduate (including equivalency)

**Disability**

No

## Occupation Information



**Trade/Occupation**

WELDER, COMBINATION

**RAPIDS Code**

0622

**O\*NET Code**

51-4121.00

**Term Length (hours)**

6000

**Probation Period (hours)**

1500

## Related Training Information



**Related Training Instruction Provider**

FCI HERLONG

**Length of Instruction**

432 Hours Total

**Are Wages Paid During RTI?**

No

**Hours When Related Instruction Is Provided**

Both During & Not During Work Hours

**Credit for Previous On-the-Job Learning Experience ⊘\***    0



**Credit for Previous Related Instruction Experience ⊘**    0

## Wage Schedule



**Entry Wages \***

$0.07 Hourly

**Journeyworker's Wage (Hourly)**

$1.25

(i.e., Experienced Worker)

**Selected Wage Schedule**

**WELDER, COMBINATION Levels**

| Period | % of Journeyworker Wage | Duration (Hours) | Description |
|---|---|---|---|
| 1st | 50% | 1500 | |
| 2nd | 60% | 1500 | |
| 3rd | 70% | 1500 | |
| 4th | 80% | 1500 | |
| End Wage | 100% | 6000 | |

# APPRENTICE MONTHLY PROGRESS RECORD
## ON THE JOB TRAINING
### (Total Program Hours 6000)

Name: Smith  Reg. 16882-629

Month: Sept  Year 2022

FCI HERLONG
WELDER

Enter the total hours from the previous Monthly Progress Record in: (Total hours to Date)

KEEP A COPY OF EACH MPR FOR YOUR NEXT MONTH ENTRY.

List work progress as per standards

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Monthly Hours | Hours to date |
|---|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|------|------|
| Installation & Service | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Shielded Metal Arc Welding | | | | 9 | | | | | | 9 | | | | | | | 9 | | | | | | | 8 | | | | | | | | 35 | 279 |
| Gas Metal Arc Welding | | | | | 9 | | | | | | 8 | | | | | | | 8 | | | | | | | 8 | | | | | | | 33 | 273 |
| Gas Tungsten Arc Welding | | | | | | | | | | | | | | | | | | | 8 | 8 | | | | | 8 | 8 | 8 | 9 | | | | 33 | 136 |
| Oxygen Arc Welding | | | | | | | | | | | | | | 5 | | | | | | | | | | | | | | | | | | 11 | 164 |
| Metalizing, Fused Metalizing Coating & ARC-Spray | | | | | | 5 | | | | | | | 6 | | | | | | | | | | | | | | | | | | | 13 | 95 |
| Electrical Practices | | | | | | 3 | 4 | | | | | | 4 | | | | | | | | | | | | | | | | | | | 11 | 65 |

Instructors Comments:

Journeyman Signature: RR

I certify the above information is correct:

Apprentice's Signature

**Total Hours = 1012**

Prev 876

# APPRENTICE MONTHLY PROGRESS RECORD
## RELATED INSTRUCTION
### 6000 Total Hours

Enter the total hours from the previous Monthly Progress Record in:
(Total hours to Date)
KEEP A COPY OF EACH MPR FOR YOUR NEXT MONTH ENTRY

FCI HERLONG
WELDER
(1 OF 2 PAGES)

Name: Smith
Reg. 16882-029

Month: Sept

Year: 2022

| | | Each day list the Number of hours | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Total Hours |
|---|---|1|2|3|4|5|6|7|8|9|10|11|12|13|14|15|16|17|18|19|20|21|22|23|24|25|26|27|28|29|30|31|---|
| 1 | Metals & Their Uses | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 2 | Heat Treating & Forging | | | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 3 | Basic Welding Metallurgy | | | | | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 4 | Welding Practice, Welding Fit-up | | | | | | | 2 | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 5 | Welding Symbols | | | | | | | | | | 2 | | | | | | | | | | | | | | | | | | | | | | 2 |
| 6 | Blueprint Reading | | | | | | | | | | | | | | 2 | | | | | | | | | | | | | | | | | | 2 |
| 7 | Measuring Instruments | | | | | | | | | | | | | | | | 2 | | | | | | | | | | | | | | | | 2 |
| 8 | Safety Practices | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Total Apprenticeship Hours 6000

Instructors Comments:
Instructor's Signature: _____
Total Hours to Date: 1/82

Monthly Total Hours: 26

I certify the above information is correct:
_____
Apprentice's Signature

# APPRENTICE MONTHLY PROGRESS RECORD
## RELATED INSTRUCTION
### 6000 Total Hours

Enter the total hours from the previous Monthly Progress Record in:
**(Total hours to Date)**

KEEP A COPY OF EACH MPR FOR YOUR NEXT MONTH ENTRY

Name:     Reg.

FCI HERLONG
WELDER
*(2 OF 2 PAGES)*

Month     Year

**Each day list the Number of hours**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Apprenticeship Hours **6000** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9   Gases Used in Welding, Usage, Storage & Control | | | | | | | | | | | | | | | | | | | | | 2 | | | | | | | | | | | 2 |
| 10   Electric Power Supply Sources for Welding Processes | | | | | | | | | | | | | | | | | | | | | | | 2 | | | | | | | | | 2 |
| 11   Hoisting & Material Handling | | | | | | | | | | | | | | | | | | | | | | | | | 2 | | | | | | | 2 |
| 12   Uses & Storage of Flammables & Recognizance of Flammables & Explosive Hazards | | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 | | | | 2 |
| 13   Practices for Control of Fires | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 | 2 |

Instructors Comments:

Instructor's Signature: _____   Monthly Total Hours: **26**

Total Hours to Date: **192**

*I certify the above information is correct:*

_____
Apprentice's Signature

# HERLONG FCI - 2018-ZA-71003-007140

Summary    Apprentices    Occupations    Wage Schedules    Contacts    User Accounts    Reports    Documents    Related Actions

## Register Apprentice

OMB# 1205-0223
Expires: 1/31/2020
[+] View Description

| Apprentice Information | Demographics | Occupation Details | Wage | Submit |

## Program Selection

**Program**

2018-ZA-71003 Federal Bureau of Prisons (BOP)

## Occupation Information

**Occupation**

ELECTRICAL TECHNICIAN (0155)  V1 Time-Based

**Date Apprenticeship Begins** *

Nov 1, 2019     *Herlong*

## Apprentice Details

**First Name**

Andrew

**Last Name**

Smith

**Middle Name**

**Suffix**

**Social Security Number** ⊘

***-**-2090

**Date of Birth**

Feb 12, 1985

**Gender**

Male

**Employment Status**

New Employee

### Contact Information

**Address**

P.O. Box 900

**City**

Herlong

**State**

California

**Zip Code**

96113

**Telephone**

(530) 827-8000

**Email**

### Employer Information

**Employer Name**

HERLONG FCI

**Address**

741-925 ACCESS ROAD A-25

**City**

HERLONG

**State**

California

**Zip**

96113

# FCI HERLONG
## OJT SUMMARY WORKSHEET
### Electrician

Instructions:
Complete Columns 1, 2, & 3 when apprentice is indentured into the program.
Complete Columns 4 & 5 when the apprentice completes the program or withdrawn due to PMI or PWV.

Apprentice Name: Smith _____ Andrew _____ Reg. No.: 16882-029

| | | Last | First | | |

| WORK PROGRESS | COLUMN 1 Total Hours Required per Standards | COLUMN 2 Allocated Credit For Previous Hours (per DOL) | COLUMN 3 Hours Remaining to Complete Program (Subtract Column 2 from Column 1) | COLUMN 4 Hours Completed at FCI Herlong (From local Records) | COLUMN 5 Hours Completed in Entire Program (Add Column 2 and Column 4) |
|---|---|---|---|---|---|
| Wiring | 1,100 | 522½ | 577½ | 56.5 | 579 |
| Control Equipment | 500 | 237½ | 262½ | 43.5 | 281 |
| Fixture Work | 200 | 95 | 105 | 40 | 135 |
| Lighting | 1,500 | 712 | 788 | 28 | 740 |
| Assembly | 300 | 142 | 158 | 40 | 182 |
| Installation | 1,200 | 570 | 630 | 36 | 606 |
| Electric Motors | 500 | 237 | 263 | 40 | 277 |
| General Maintenance | 750 | 356 | 394 | 40 | 396 |
| Hanging | 100 | 47 | 53 | 35 | 75 |
| Electronic Controls & Equipment | 200 | 95 | 105 | 40 | 135 |
| Instrumentation | 1,250 | 593 | 657 | 32 | 625 |
| Safety Electrical | 400 | 190 | 210 | 32 | 222 |
| | | | (Close out SENTRY with these hours) TOTAL | 463 | 4,253 |

_____ 4-1-21 _____  _____ 4-1-21 _____
**Apprenticeship Coordinator**    Date            **Supervisor of Education**    Date

# EXHIBIT C

## LETTERS OF SUPPORT AND BOP REFERENCES

Support Letters

Dani Smith (Wife) 520-343-0792
Anna Smith (Daughter) 515-351-2708
Tami Collins (Mother) 520-431-4352
Cal Collins (Father) 515-408-5060
Mary and Vern Bauer (Family Friend) 515-351-0323
Robert Goodner (Friend/Mentor- IDOC Employee) 515-269-7828
Samson Searcy (Friend/Sponsor) 515-302-1417

BOP References

Mr. Munn- Unit Officer- FCI Herlong
Mr. Layne- Electrical Boss- FCI Herlong
Mr. Hubbard- Electrical Boss- FCI Herlong
Mr. Rodriguez- Welding Boss- FCI Herlong
Mr. Pedraza- Electrical Boss- FCI Tucson
Mr. Kitzman- Recreation Boss- FCI Tucson

Feel free to contact any and all References

Your Honor,

I am writing this letter on behalf of my son, Andrew Smith 16882-029. He was sentenced to 188 mos. federal time on drug charges. He was placed in Tucson, AZ. I live in Casa Grande AZ and his wife and kids moved here shortly afterward. Andrew has a step-daughter Anna, 17, his son, Holden 9 and Avery is 6. They went and visited him every weekend and Andrew called every night. They made the best of a bad situation to keep the kids in his life and visa versa as much as possible.

Within about a yr or so Tucson changed the make-up of the prison and everyone was shipped out. Andrews wife and kids moved back to Iowa in the hopes he would get placed in the midwest. At that time the 1st step act was made policy and went into affect, in which Andrew was eligable for. The BOP did not due their due diligence in making any effort to place Andrew close to family either Arizona or the midwest. He was shipped to Herlong CA, which is where he still is now. If all that wasnt bad enough... Covid hit! Herlong has been on total lockdown for the most part for the past year and a half. Trying to keep his family together has been a real struggle.

Anna has a boyfriend who she wants Andrew to meet. She respects what he thinks and knows he always has her best interest at heart. His son Holden is an awesome kid who wears his heart on his sleeve and tries so hard to have friends. He has been a victim of bulling at school for the past year almost on a daily basis. He lives at home with all girls... they are mean to him all the time, and I know how

excessive sentences. Get these men back out to help contribute to the workforce, let them be men to contribute to their families, safeguard and raise their children to be the very best they can be. We owe it to our children and to preserve the family dynamic.

You have it within your power + judgement to make much needed changes. You can set the boxes they need checked off to get an early release as well as the expectations they need to follow on the outside. Give them a chance to prove themselves

Thank You so much for taking time to read my letter.

Tami Collins

Tami Collins
420 E. McMurray Blud.
#5
Casa Grande, AZ 85122

PHOENIX AZ 8

21 MAR 2022 PM 11



Andrew Smith 16882-039
ECI, Herlong
P.O. Box 800
Herlong, CA 96113

# Andrew Smith

To whom it may Concern

I Cal Collins dad to Andrew believe that a love of your Kids never Stops threw thick and thin being there is very important part to love them and guide them so they Know you love them. As a dad I was working on the road and missed out on to much of h's life. I believe it would be beneficial for all if my son was released to be a loving father and a part of are lives. I think he is ready to put the past behind him and be a Parent that I Know he wants to be. I miss him very much and because of covid haven't been able to see him and that's not right

Cal Collins

Dear Judge                                          3-18-2022

    Holden and Avery are feeling the loss of
their dad, especially as they grow older. Avery
has said numerous times that she wants her
Dad and wants to see him. Holden even misses
him more.

    Holden and Avery need a second parent to
keep them from harm. They recently moved away
from Fort Dodge to living south of Carroll, Iowa.
While living in Fort Dodge, they lived close to the
river and would walk to the river while their
Mom was at work. Neither one of the kids have
a fear of water. Holden was 6 yrs old and
Avery was 5.

    Holden is now in 2nd grade and was being
bullied on the school bus and in school. The
kids in his class found out his Dad was in
jail and it created issues. Holden ended up
fighting and started pooping in his underwear.
Avery his sister picks on him also and told
the classmates that Holden poops his pants.

    Holden has a very kind heart and is being
being bullied by his sisters also. Anna, 17,
is jealous of Holden and hits him. Anna has
been in charge of Holden and Avery since she was
a young girl - too young to be put in charge
and be responsible at the age of 11. Dani worked
at nights in Fort Dodge until she moved to
Carroll.

    Dani has made comments "I don't know how
to raise a boy". Holden comes to our house,
which is now 1 hour away instead of 30 minutes,

B Bauer
4 Easton Ave
?????? IA 50543

DES MOINES IA 500
18 MAR 2022 PM 3 L

Andrew Smith 16882-029
Federal Correctional Institution
PO Box 800
Herlong CA 96113

95113-

Dear Honorable Judge,

My name is Robert William Goodner. I am a correctional officer at the Fort Dodge Iowa Correctional Facility in Fort Dodge, Iowa. I am a friend of Andrew Cole Smith (inmate # 16882-029). I would like to show my support for him in asking you to grant him in an early release. I've known Andrew since he was 16 years old and consider him a very good friend of mine. Somewhere along the way he made some mistakes, however the Andrew I know was and still is good guy. He was the type of person who would give you the shirt off his back if you needed it. If you called him, he was always there to talk too, no matter what. He is a good father and he was never a violent type of guy. The Andrew I know would always stop people from fighting or descaled a situation. He is a good father that likes to spend time with family and friends. He enjoys fishing, camping and hunting. If Andrew was released today, I would help him with a positive place to stay and could get him a job working with my step dad dry-walling. Most of the people indicted with him have been released already. Some have been out of prison and reoffended again. I'm asking you to please evaluate this case again and grant him an early release. Please we all miss Andrew and we all know he is capable of doing good things in life. I vouch for him and that he is a good candidate for an early release. I know from the bottom of my heart, he would not let any of us down, if given a second chance. I am asking for you to evaluate his situation and help make things right. Thank you and god bless.

Robert William Goodner

Robert Goodner
1024 Bank St,
Webster City, IA 50595

Andrew Smith 16882-029
FCI Herlong
P.O. Box 800

3-16-2022

To whom it may concern:

My name is Samson Searcy. I am writing this letter in regards to Andrew Smith, and asking the court to show leniency in his sentence.

I have known Andrew for nearly twenty years. Although Andrew has remained my friend, he is not the same man he was prior to his arrest in all the right ways. He now understands the harm he was doing to himself, his family and the people he was providing drugs too. Andrew has voiced his remorse for the crimes he committed and the hurt he caused. He has been taking steps to better himself for his future, but mostly for his families' future. He has nearly completed his electrical apprenticeship and recently started in welding. He wants nothing more than to be a father and be there for his children so they do not go down the same path he did as a child. Andrew grew up in a fatherless household and his mother was an addict. He had very poor role models and made very poor decisions in many ways because of this. If Andrew was to have a reduction to his sentence, I would be here for him to help him in his sobriety and his return to becoming a productive member of society. Andrew made a lot of mistakes in his past but I truly believe if he was to be given another chance at a life, he would make it count. He would show his children what being a man, father and friend was meant to look like. He would show them the kind and gentle person he was even during his struggle with addiction. His family has missed him very much, his children deserve to know their faither and deserve the chance to have him in their lives, they have already missed so much with him being gone.

Thank you for taking the time to read this letter and reviewing his case. Not only does this mean a lot for Andrew, but it means the most to his family who are now left with the burden of his absence.

If you would like to contact me with any further questions or concerns, my address is P.O. Box 238 Gowrie, IA 50543. My cell phone is 515-302-1417.

Sincerely,

Samson E. Searcy

# EXHIBIT D

IDOT RECIEPTS FOR FINES AND CIVIL PENALTY



www.iowadot.gov

**Driver & Identification Services**
PO Box 9204 | Des Moines, IA 50306-9204
Phone: 515-244-9124 | Fax: 515-239-1837

$1523.12
+ 36.23
(559.35)

Customer #: 4997271

Andrew Cole Smith
1202 S 28TH ST
FORT DODGE, IA 505016327

| | |
|---|---|
| Date of Report: | 07-17-2020 |
| Driving Privilege Status: | Suspended |
| Credential Issued: | None |
| Credential Expiration: | None |

This is your driving privilege record as it exists today. Information is subject to change.

For information on possible Temporary Restricted License (TRL) eligibility, please contact us at 515-244-8725. *HOB*

☐ Pay required civil penalty of $400. ✓

　　To pay visit: https://mymvd.iowadot.gov/CivilPenalty or any driver's license service center.

☐ Complete the Drinking Driver School **(DDS)**.

　　For additional information visit: http://owi.educateiowa.gov or call **515-281-5251**.

*Submitted To Dept Of Ed for Verification*

☑ Complete the Substance Abuse/Evaluation and Treatment or Rehabilitation Services **(SAE)**.

　　A listing of approved facilities in Iowa can be found at: http://owi.educateiowa.gov or call **515-281-5251**.

☐ Pay the following Judgements:

　　Satisfy Judgment number SCSC044720. VS Andrew Cole Smith　　　　　*36.23*
　　Iowa District Court - Webster County, ,

☐ Pay the following fines:

　　Iowa-FD07D77 on 11-07-2003, FD07D78 on 11-07-2003. Contact Webster County Clerk of　　*40.12*
　　Courts Office (515)576-7115.

　　Iowa-G666656 on 06-02-2003. Contact Boone County Clerk of Courts Office (515)433-0561.　*342.05*

　　Iowa-302213812081102322545 on 08-11-2012. Contact Webster County Clerk of Courts Office　*147.75*
　　(515)576-7115.

　　Iowa-302213812081102410490 on 08-11-2012. Contact Webster County Clerk of Courts Office　*195.*
　　(515)576-7115.

　　Iowa-3022T3812081102460210 on 08-11-2012. Contact Webster County Clerk of Courts Office　*147.75*
　　(515)576-7115.

　　Iowa-302LAND1503132136333 on 03-13-2015. Contact Webster County Clerk of Courts Office　*457.50*
　　(515)576-7115.

　　Iowa-302URNS160630T618274 on 06-30-2016. Contact Webster County Clerk of Courts Office　*135*
　　(515)576-7115.

Pay online at https://www.iowacourts.state.ia.us

*1901.4*

If you are not able to pay your court fines and civil penalties in full there may be another option. The payment plan referred to as either the License Reinstatement Program or County Attorney Payment Plan (CAPP) may be available. Contact the clerk of court in the county where the violation(s) occurred to see if you qualify. For additional information visit: https://iowadot.gov/mvd/driverslicense/capp-map

Any items with checked boxes above are compliance requirements that must be continuously maintained for specific amounts of time.

Additionally, you may be required to successfully pass the operator knowledge test, driving test and vision screenings. Knowledge and driving tests are required if your Iowa driver's license has been suspended/revoked or invalid for more than one year. Study materials may be found online (https://iowadot.gov/mvd/driverslicense/dlmanual/dlmanual.pdf) or at any of our service centers.

**We recognize life doesn't stop just because you're not currently eligible for a driver's license. We're here to help you,** by providing alternative transportation options that may be of interest to you. We don't want to see our customers in a cycle of driving while ineligible and receiving further citations and impacts to their driving record and finances.



**Payment Confirmation**

Thank you, your payment was successfully processed. You may print this receipt page by selecting Print. For questions or more information, please call (515) 244-1052.

**Customer Information**

**Email:** Tlc2469@hotmail.com

State of Iowa - Iowa Department of Transportation

For immediate access to the requested record, select Continue or Next Steps. If you have questions regarding a certified driving record or obtaining one, call our Information Call Center at 515-244-1052.

Credit Card ending in:

\*\*\*\* \*\*\*\* \*\*\*\* 7763

| Description | Unit Price | Qty | Price |
|---|---|---|---|
| Civil Penalty - $200 | 400.00 | 1 | 400.00 |
| IOWAccess Value Added Service Fee | 1.50 | 1 | 1.50 |
| Credit Card Processing Fee | 1.50 | 1 | 1.50 |

**Amount:** 403.00

**Order ID:** 12855672

**Transaction Date:** 5/4/2022 5:24 PM CST

**Customer Number:** 4997271

Next Steps

**Support Contact Information**
**Contact Name:** State of Iowa – DOT Motor Vehicle Division
**Phone Number:** (515) 244-1052
**Website:** https://iowadot.gov/
**Address:** PO Box 9204 Des Moines, IA 50306-9204

**FAQs:** https://www.nic-iowa.com/ccphelp.html

Clerk-of-Court: WEBSTER COUNTY CLERK OF COURT        Receipt Date: AUG-03-2021
701 CENTRAL AVE, SUITE 6
FORT DODGE, IA 50501
(515)-576-7115


Payor PIN: WE1094171                Case #: 02941  SCSC044720    Rcpt #: 757239
                                    Citation #:
                                    BatchID: CLAV94
ANDREW COLE SMITH                   Remitted by: ANDREW COLE SMITH
1202 S 28TH STREET                  Payment Type: CASH
FORT DODGE, IA 50501                Payment Ref#:

                                            Total Paid:        $36.23

                                Balance Due As Of AUG-03-2021        $0.00

Clerk-of-Court: WEBSTER COUNTY CLERK OF COURT       Receipt Date: AUG-03-2021
701 CENTRAL AVE, SUITE 6
FORT DODGE, IA 50501
(515)-576-7115


Payor PIN: WE1094171

ANDREW COLE SMITH
1202 S 28TH STREET
FORT DODGE, IA 50501

Case #: 02941  STFD07D78     Rcpt #: 757233
Citation #: FD07D78
BatchID: CLAV94
Remitted by: ANDREW COLE SMITH
Payment Type: CASH
Payment Ref#:

                              Total Paid:          $40.12

                 Balance Due As Of AUG-03-2021       $0.00

Clerk-of-Court: BOONE COUNTY CLERK OF DISTRICT COURReceipt Date: MAY-04-2022
201 STATE ST
BOONE, IA 50036
(515)-433-0561

Payor PIN: BO1087014

ANDREW COLE SMITH
NCCF 313 LANEDALE
ROCKWELL CITY, IA 50579

Case #: 02081  NTWG666656     Rcpt #: 507214
Citation #: WG666656
BatchID: ICIS
Remitted by: ANDREW COLE SMITH
Payment Type: ELECTRONIC PUBLIC PAYMENT
Payment Ref#: IOWJU2011383770

                              Total Paid:        $324.05

         Balance Due As Of MAY-04-2022        $0.00

Clerk-of-Court: WEBSTER COUNTY CLERK OF COURT       Receipt Date: AUG-03-2021
701 CENTRAL AVE, SUITE 6
FORT DODGE, IA 50501
(515)-576-7115


Payor PIN: WE1094171                  Case #: 02941  STA1036565   Rcpt #: 757236
                                      Citation #: 302 2138 120811 023254 5
                                      BatchID: CLAV94
ANDREW COLE SMITH                     Remitted by: ANDREW COLE SMITH
1202 S 28TH STREET                    Payment Type: CASH
FORT DODGE, IA 50501                  Payment Ref#:

                                           Total Paid:       $147.75

                              Balance Due As Of AUG-03-2021        $0.00

Clerk-of-Court: WEBSTER COUNTY CLERK OF COURT        Receipt Date: AUG-03-2021
701 CENTRAL AVE, SUITE 6
FORT DODGE, IA 50501
(515)-576-7115


Payor PIN: WE1094171                Case #: 02941  STA1036564    Rcpt #: 757237
                                    Citation #: 302 2138 120811 024104 9
                                    BatchID: CLAV94
ANDREW COLE SMITH                   Remitted by: ANDREW COLE SMITH
1202 S 28TH STREET                  Payment Type: CASH
FORT DODGE, IA 50501                Payment Ref#:

                                         Total Paid:        $195.00

                                    Balance Due As Of AUG-03-2021      $0.00

Payor PIN: WE1094171

ANDREW COLE SMITH
1202 S 28TH STREET
FORT DODGE, IA 50501

Case #: 02941  NTA1036558    Rcpt #: 757238
Citation #: 302 2138 120811 024602 1
BatchID: CLAV94
Remitted by: ANDREW COLE SMITH
Payment Type: CASH
Payment Ref#:

Total Paid:        $147.75

Balance Due As Of AUG-03-2021        $0.00

```
Clerk-of-Court: WEBSTER COUNTY CLERK OF COURT        Receipt Date: AUG-03-2021
701 CENTRAL AVE, SUITE 6
FORT DODGE, IA 50501
(515)-576-7115


                                  Case #: 02941  NTA1052102    Rcpt #: 757235
Payor PIN: WE1094171              Citation #: 302 LAND 150313 213633 3
                                  BatchID: CLAV94
ANDREW COLE SMITH                 Remitted by: ANDREW COLE SMITH
1202 S 28TH STREET                Payment Type: CASH
FORT DODGE, IA 50501              Payment Ref#:

                                  Total Paid:          $457.50

                             Balance Due As Of AUG-03-2021        $0.00
```

Payor PIN: WE1094171

ANDREW COLE SMITH
1202 S 28TH STREET
FORT DODGE, IA 50501

Case #: 02941  STA1059114    Rcpt #: 757234
Citation #: 302 URNS 160630 161827 1
BatchID: CLAV94
Remitted by: ANDREW COLE SMITH
Payment Type: CASH
Payment Ref#:

Total Paid:       $135.00

Balance Due As Of AUG-03-2021      $0.00

# EXHIBIT E

COVID 19 AND OTHER BOP ISSUES

Notice for Inmates who are currently designated for a lesser
security transfer and/or nearer release transfer.

We received guidance from Central Office to not submit any 308
(Lesser Security) or 313 (Nearer Release) transfers until spring
of 2021, due to COVID-19. Also, anyone who is currently
designated for a Lesser Security or Nearer Release transfer will
be canceled until spring of 2021. The BOP must first move about
17,000 inmates from Detention Centers and USMS facilities. If
you have any questions or concerns please speak with your Unit
Manager.

Paul Thompson, Warden          6/19/2020

✳ Covid lockdown started 3/2020. Lockdown was
24/7 with only 5 min out Mon., Wed, and Fri
for showers. We had no access to programming, commissary,
phones or computers. All meals were served through the
slot in the door and contained either peanut butter and
jelly sandwiches and chips or Bolgna and chips.
This lockdown lasted until Sept 2020. In Sept
we were allowed out for 1 hr for shower, phones,
and emails Mon-Fri. Nothing on weekends. It is
also now Sept of 22 and I have not been approved
for nearer release transfer.

Notice to the Inmate Population at FCI Herlong, California

From: Paul Thompson, Warden          12/7/2020

COVID-19 Status at FCI Herlong, California

On November 18, 2020, 3 inmates in the general population tested positive for COVID-19. The entire institution was placed on quarantine. Since that day, inmates from additional housing units have tested positive for COVID-19. Inmates reported minor symptoms to staff, were assessed by Health Services and were tested via rapid test with additional PCR testing. Health Services staff have increased rapid and PCR testing in all affected housing units. Additionally, serial testing has been conducted in all housing units to determine if there are additional housing units affected.

All inmates with positive COVID-19 results were and continue to be placed into isolation in accordance with established CDC guidelines. Unit assignments for some inmates are changing based on total isolation cases within each housing unit as results of either positive or negative COVID-19 results become available. Inmates are continuing to recover from COVID-19. Inmates in recovered status will be used to supplement inmate work details and inmate services as a move toward modified operations continue.

I encourage you to immediately report to staff any symptoms or illness so you may be appropriately evaluated timely. In addition, please report any symptoms of Acute Loss of Smell or Taste. This can be a common symptom of pre-COVID-19 illness and if you are experiencing these symptoms you need to inform staff immediately so you can be assessed by the Health Services staff.

The executive staff, Health Services and I are monitoring the status of FCI Herlong daily and will continue to make adjustments to institution operations and inmate services as needed to ensure a safe return to a normal modified operation.

Your Unit Team should have already issued you 2 stamps to allow immediate communication with your family. I anticipate expanding opportunities for communication with your family as soon as safely possible. I appreciate your cooperation during this difficult and unique situation. With continued cooperation and successful preventative strategies I have confidence we will continue on the right path.

Be safe and be well!

Back to 24/7 on Nov 18 2020. This lasted until Dec 16 which still we had no access to anything with limited time out of cells.

Notice to the Inmate Population at FCI Herlong, California

From: Paul Thompson, Warden  12/14/2020

Change to Schedule at FCI Herlong, California

Beginning on Tuesday, December 15, 2020, you will have limited access to the telephones and computers by cohort utilized on showering days. Showers will continue on Monday, Wednesday and Friday. On Tuesday and Thursday, each cohort will be provided 30 minutes to utilize telephones, computers, and charge MP3 players. The showers will not be available for use on these days.

Inmates will not be allowed to communicate with each other at cell doors. Any inmate communicating at cell doors will lose telephone/computer privileges for that day and will jeopardize the communication plan for the remainder of the housing unit.

Health Services staff have increased rapid, PCR and serial testing in all housing units. All inmates with positive COVID-19 results are being placed into isolation in accordance with established CDC guidelines. Unit assignments for some inmates are changing based on total isolation cases within each housing unit as results of either positive or recovered COVID-19 results become available. Inmates are continuing to recover from COVID-19 and being utilized on inmate work details and providing inmate services as a move toward modified operations.

I encourage you to immediately report to staff any symptoms or illness so you may be appropriately evaluated timely. In addition, please report any symptoms of Acute Loss of Smell or Taste. This can be a common symptom of pre-COVID-19 illness and if you are experiencing these symptoms you need to inform staff immediately so you can be assessed by the Health Services staff.

The Executive Staff, Health Services and I are monitoring the status of FCI Herlong daily and will continue to make adjustments to institution operations and inmate services as needed to ensure a return to a normal modified operation.

I appreciate your cooperation during this difficult and unique situation. With continued cooperation and successful preventative strategies, I have confidence we will continue on the right path.

Be safe and be well!

This notice is to inform you of the implementation of the Modified Operations Schedule.

Beginning Monday, February 22, 2021, we will be utilizing the attached Modified Operations Schedule. We will begin having the grab and go breakfast Monday, Wednesday, Friday, and the grab and go lunch on Tuesday, and Thursday. All other meals will be conducted in the units.

Legal mail move will be combined with the 7:30 AM Programs Move.

Recreation will alternate Sundays as listed. Weekend recreation will be 1 hour 25 minutes in duration to allow for the moves to and from the rec yard. During the week recreation will be 55 minutes, again to allow for movement to and from the units.

Finally, social visiting will resume on February 26, 2021, adhering to the previous COVID-19 guidelines.

As with all schedules and plans, this can be changed and modified as needed. Inmate behavior will dictate the duration of this action plan.

_____                         _____
A, Salcido, Captain                              2/19/21
                                                 Date

The first time we started to get any meaningful time out of the cell since 3/2020

# Notice to the Inmate Population at FCI Herlong, California

From: Paul Thompson, Warden          4/30/2021

## COVID-19 Status/Change in Operations at FCI Herlong, California

Beginning next week, operations at FCI Herlong, California, will continue to be modified. Inmate work details will be increased, however not all work details will be assigned at 100% levels as the institution is not operating at 100% yet. Activities within the inside and leisure recreation areas will be expanded and additional meals being served in the dining hall will be forthcoming. To ensure continued successful mitigating strategies including continued regular sanitation of all areas, limitations on activities and movement will continue as needed.

Additionally, cell sanitation will be monitored more frequently. Effective, May 10, 2021, increased sanitation inspections will be conducted and, if cells and areas are not found to be in compliance with posted standards, incident reports and/or modifications of existing programs may be imposed. As a reminder, "clothes lines", rolled towels in the cell threshold, anything hanging on the wall and excess clutter is not allowed. All inmate property must fit into the assigned lockers. Each unit has posted cell sanitation expectations and examples.

I encourage you to immediately report to staff any symptoms or illness so you may be appropriately evaluated timely. In addition, please report any symptoms of Acute Loss of Smell or Taste, New-Onset Cough, New-Onset Trouble Speaking/Difficulty Breathing, Fatigue, Muscle or Body Aches, Sore Throat, Stuffy/Runny Nose, Nausea, Vomiting or Diarrhea. These can be a common symptom of pre-COVID-19 illness and if you are experiencing these symptoms, you need to inform staff immediately so you can be assessed by the health services staff.

The executive staff, health services and I are monitoring the status of FCI Herlong daily and will continue to make adjustments to institution operations and inmate services as needed to ensure return to a normal modified operation.

Your compliance with posted regulations and modified operations is needed to continue progressing toward a more normal operation. I appreciate your cooperation throughout this difficult and unique situation. With continued cooperation and successful preventative strategies, I have confidence we will continue on the right path.

Be safe and be well!

## Notice to the Inmate Population at FCI Herlong, California

From: Paul Thompson, Warden          9/13/2024

### COVID-19 Status at FCI Herlong, California

On September 9, 2021, 62 inmates in the general population tested positive for COVID-19. The entire institution was placed on quarantine. All inmates assigned to the affected units have been tested via BinaxNOW or PCR testing. Testing of the immediate affected housing units was completed on Friday, September 10, 2021.

As of today, 93 inmates have tested positive for COVID-19 and are currently in isolation.

Beginning Monday, September 13, 2021, aggressive targeted and random inmate COVID testing for the remainder of the housing units will begin.

Once test results are received, the institution status will be reviewed and adjusted as necessary. I will keep you updated on the institution status and operations.

I encourage you to immediately report to staff any symptoms or illness so you may be appropriately evaluated and assessed by health services staff timely. Common symptoms include fever, dry cough, tiredness, aches and pains, sore throat, diarrhea, headache, loss of taste or smell. These are not all inclusive and some individuals may experience all or none of the above listed symptoms.

I appreciate your cooperation during this difficult and unique situation. With continued cooperation and successful preventative strategies I have confidence we will continue on the right path.

Be safe and be well!

* Back on 24/1 lockdown w/ 5 min showers 3x per week. This lasted once again for months

# Notice to the Inmate Population at FCI Herlong, California

From: Paul Thompson, Warden

9/22/2021

## COVID-19 Status at FCI Herlong, California

Between September 20, 2021 and September 21, 2021, 68 inmates cleared isolation and were moved back into their housing units. These inmates are being assigned to food service to assist in meal preparation, the compound to resume trash collection and sanitation and also as unit orderlies to maintain sanitation of the housing units.

Aggressive targeted and random COVID testing is continuing throughout the inmate population. Once test results are received, the institution status will be reviewed and adjusted as necessary. I will keep you updated on the institution status and operations.

I encourage you to immediately report to staff any symptoms or illness so you may be appropriately evaluated and assessed by health services staff timely. Common symptoms include fever, dry cough, tiredness, aches and pains, sore throat, diarrhea, headache, loss of taste or smell. These are not all inclusive and some individuals may experience all or none of the above listed symptoms.

I appreciate your cooperation during this difficult and unique situation. With continued cooperation and successful preventative strategies I have confidence we will continue on the right path.

Be safe and be well!

# FORMER BOP DIRECTOR GETS SENATORIAL KICK IN THE PANTS ON HIS WAY OUT THE DOOR

Widespread drug abuse, substandard health care, violence and horrific sanitary conditions are rampant at USP Atlanta, according to a Senate Permanent Investigations Subcommittee investigation revealed last week.

The dysfunction at USP Atlanta is so notorious within the BOP that "its culture of indifference and mismanagement is derisively known among bureau employees as 'the Atlanta way'," the New York Times reported last week. Witnesses at the Subcommittee hearing last week "describe[ed] dozens of violent episodes and the systematic effort to downplay and cover up the crisis over the past few years," The Times reported.

The prison's conditions reflect wider problems in the BOP's network of 122 facilities housing about 158,000 inmates, The Times said. The system has suffered from chronic overcrowding, staffing shortages, corruption, sexual violence and a culture that often encourages senior officials to minimize the extent of the problems.

Associated Press reported that outgoing BOP Director Michael Carvajal, who testified under a Subcommittee subpoena, "faced a bipartisan onslaught Tuesday as he refused to accept responsibility for a culture of corruption and misconduct that has plagued his agency for years."

Carvajal argued, "he had been shielded from problems by his underlings even though he'd been copied on emails, and some of the troubles were detailed in reports generated by the agency's headquarters." He blamed the size and structure of the BOP for his ignorance on issues such as inmate suicides, sexual abuse, and the free flow of drugs, weapons and other contraband that has roiled some of the BOP's 122 facilities. His attempts to deflect responsibility for his leadership failings sat well with neither Subcommittee chairman Sen Jon Ossoff (D-GA) nor its ranking member, Sen Ron Johnson (R-WI).

Colette S. Peters, the longtime head of Oregon prisons, assumes the BOP director's post on Tuesday. Carvajal finally will get the retirement he announced seven months ago, but not before the Subcommittee made it clear that it was fed up with his blandishments.

"Inmates hanging themselves in federal prisons, addicted to and high on drugs that flow into the facilities virtually openly," Ossoff told Carvajal, "and as they hang and suffocate in the custody of the US government, there's no urgent response from members of the staff, year after year after year It's a disgrace. And for the answer to be 'other people deal with that. I got the report. I don't remember'. It's completely unacceptable."

"It's almost willful ignorance, and that's what I find disturbing," Johnson said. "'Don't want to know what's happening below me. Don't want to hear about rapes. Don't want to hear about suicides'."

In one of the hearing's most heated moments, Ossoff pressed Carvajal on rampant sexual abuse at FCI Dublin, a federal women's prison in California's Bay Area known to staff and inmates as the "rape club." Among the Dublin employees charged criminally so far is the prison's former warden.

"Is the Bureau of Prisons able to keep female detainees safe from sexual abuse by staff? Ossoff asked. Yes or no?

"Yes, we are," Carvajal replied. "In those cases when things happen, we hold people appropriately accountable."

"You are the director at a time when one of your prisons is known to staff and inmates as a 'rape club'," Ossoff shot back. Carvajal had no response.

Rebecca Shepard, a staff attorney for the Federal Defender Program Inc., said USP Atlanta subjects inmates to inhumane and substandard conditions:

I have seen clients routinely locked down and allowed out of their cells for extremely limited periods of time, such as only 15 to 30 minutes, three to four times a week, or only an hour each day. And these lockdowns persist for months. Clients are treated as though they are in solitary confinement, not because of their behavior, but because of their misfortune and being placed at USP Atlanta.

The problems were "stunning failures of federal prison administration," Ossoff said. But despite "unequivocal internal reports of abuse and misconduct, the situation continued to deteriorate."

Attorney General Merrick Garland appears to be moving more decisively, especially on the issue of sexual violence against female inmates and staff members. On July 14, Deputy Attorney General Lisa Monaco announced a task force to establish a policy aimed at "rooting out and preventing sexual misconduct" by prison employees over the next 90 days. Ms. Monaco said she was also instructing frontline prosecutors to make all misconduct cases at facilities a top priority, The New York Times said.

Last week, Forbes reported that Peters will take over an agency in disarray:

Relations between management and labor is at an all-time low, the agency is failing at implementing the First Step Act and COVID-19 continues to ravage its institutions. A recent survey by Partnership for Public Service, which ranks best places to work within the US government, ranked the BOP near last among 432 federal agencies. It ranked dead last in Effective Leadership category. This comes at a time when the BOP is trying to recruit new workers to make up for many veteran BOP employees who are leaving the agency.

The Atlanta Voice, Senator Ossoff grills Federal prison officials over deplorable conditions at Atlanta Penitentiary (Jul 28)

The New York Times, Prison Personnel Describe Horrific Conditions, and Cover-Up, at Atlanta Prison (Jul 26)

Forbes, Outgoing Federal Bureau Of Prisons Director Carvajal Subpoenaed By Senate Subcommittee (Jul 19)

2022

# COVID MAY BE AT THE TOP OF DIRECTOR PETERS'S TO-DO LIST

Incoming BOP Director Colette Peters will not have much of a honeymoon as director. At last week's hearings, Sen Ossoff said that with Carvajal departing, and a new director coming in, change at the Bureau of Prison needs to happen immediately.

With a fall COVID surge anticipated, Peters might want to look first at the BOP's COVID management. At last week's Subcommittee hearings, Sen Alex Padilla (D-CA) said his office has received reports that FCI Mendota had not been following COVID-19 protocols, leading to frequent outbreaks at the facility.

Padilla and Sen Dianne Feinstein (D-CA) sent the Dept of Justice a letter in April asking about the lack of COVID-19 precautions but has never received an adequate response. In response to Carvajal's assurance that the BOP "takes these allegations seriously," Padilla said, "We communicated to you months ago that we understand they aren't being followed."

Fourteen other senators last week demanded that the BOP explain its scant use of COVID therapeutics, based on reports that the BOP used just a fraction of the COVID-19 drugs allotted by the federal government. It urges Bureau leadership to revamp its approach toward Covid-19 testing to catch more infections that could benefit from these drugs (which need to be given early in a person's illness).

"The experience of the pandemic for the federally incarcerated population remains starkly worse than for non-incarcerated individuals," the letter said. "This discrepancy can only be addressed through affirmative, comprehensive changes from the Bureau of Prisons to improve the availability of COVID-19 vaccines, testing, and therapeutics."

The Dept of Health and Human Services has reported that BOP consistently declines additional COVID-19 drugs. "We have reached out multiple times to BOP asking them why they do not want their allocations offered by HHS. They consistently say they have enough to meet demand/their demand is low," DHHS wrote in a May 4 email to Congress. Last week's letter demands information from the BOP by Sep 9, including data on the turnaround time for Covid-19 tests and the policies governing when incarcerated people are tested.

Last week the BOP reported 471 inmates and 476 staff with COVID, with COVID present in 112 facilities (the most since Mar 2). The total number of COVID tests performed on inmates fluctuates inexplicably but suggests no testing being done since Jan 25. Peters might want to start by requiring BOP COVID stats to be meaningful.

Florida Phoenix, 'Stunning, long-term failures' found in probe of Atlanta penitentiary (Jul 26)

Stat, Senators demand answers about federal prisons' scant use of Covid therapeutics (Jul 26)

2022

Letter to Michael Carvajal from Sen Benjamin Cardin (Jul 25)
<><>

federal prison employees say their lives are in danger after a series of bungled instructions and widespread supply shortages amid the coronavirus outbreak. The virus was first found in the federal prison system on Wednesday when two Bureau of Prison staff members tested positive for COVID-19.

"The agency is in chaos," said Joe Rojas, regional vice president of the Council of Prison Locals, the labor union that represents federal corrections officers. "We are just scrambling to get things in order."

One of the BOP staff members who tested positive worked at a facility in New Hampshire and may have been in contact with inmates, a BOP official told CBS News.

Trending News
Coronavirus updates: Young Americans warned they're not "invincible"
Thousands flock to Florida beaches, ignoring coronavirus concerns
Zoos are live-streaming animals to ease coronavirus isolation
The wave of coronavirus cases is shutting down Florida beaches

At the Tallahassee Federal Correctional Institution, prison employees told CBS News the officers charged with moving prisoners do not have access to protective gear. Employees said the facility has 60 masks to be shared among 200 employees, no soap in multiple staff restrooms, a lack of hand sanitizer and a supply of gloves that may only last through next week. Workers said they planned to reuse the disposable masks.

"Our supply is very limited," said Kristan Morgan, vice president of AFGE Local 1570. "It's kind of like survival of the fittest at this point."

Morgan spent Tuesday afternoon admitting a busload of 12 new inmates from an Immigration and Customs Enforcement facility, all of whom showed high fevers. On Wednesday, the facility took in 14 new inmates and anticipated four more would arrive Thursday. The facility's doctor is out sick, and their two nurses and one nurse practitioner are working around the clock.

FCI Tallahassee
This combination image shows empty supplies at FCI Tallahassee.
HANDOUT
Making matters worse are the conflicting orders coming from the federal government. Despite a BOP directive to cease inmate transfers between facilities, Tallahassee continues to receive busloads of new prisoners each day, employees say.

Across the facility, hand sanitizer dispensers sit empty, and staff have started to call in sick in order to avoid exposure. "They really betrayed," said Ray Coleman, president of AFGE Local 1570. "We have a couple correction officers with lupus. We have a couple that are pregnant things that already make their immune system compromised, so to not be taking this seriously would be detrimental."

New York City's Metropolitan Correctional Center, the facility where Jeffrey Epstein died, employees say operations have not changed despite the increased risk of contracting the virus. Employees, who spoke with CBS News anonymously for fear of professional reprisal, say the virus has exacerbated an existing staffing shortage and estimated the facility is operating with less than half its usual number of correctional officers.

Despite the lack of staff, the facility continues to book new inmates. One employee said that the specialized housing unit, or SHU an area where other facilities are housing quarantined inmates was nearly at capacity. "There's no room in SHU," the employee said. "If one inmate is contaminated there, there's nothing in place Once that whole thing spreads, no staff is going to come into work."

Another employee urged courts to cease inmate visits or set up video hearings instead. Every time an inmate visits court, the employee said, officers conduct multiple body searches. "If it's only one inmate, he comes into contact with five other law enforcement officers before he goes to court, plus the five or ten officers who go to court, plus the court personnel."

"No one wants to go and get infected and then come home and infect their children," the employee said. "The agency, in my

opinion, is not doing enough to protect us when we run into these problems."

The BOP declined to provide an interview to CBS News, but a bureau spokesperson said the agency was currently updating its published guidance on inmate movement to provide further clarification.

The spokesperson said that cleaning, sanitation and medical supplies at federal prison facilities had been inventoried as part of the bureau's pandemic influenza contingency plan. "An ample amount of supply is on hand and ready to be distributed or moved to any facility as deemed necessary," the spokesperson said. "The Bureau of Prisons is prepared to address any supply concerns if necessary."

Additional reportin

Andrew Cole Smith
Reg. No. 16882-029
Federal Correctional Institution
P.O. Box 800
Herlong, CA 96113

LEGAL MAIL

( 2 ·² 2 )

XRAYED US MARSHALS SERVICE

10/13/22 kt

RENO, NV PSDC 895
THU 13 OCT 2022 PM

FOREVER / USA
FOREVER / USA
FOREVER / USA
FOREVER / USA
FOREVER / USA
FOREVER / USA

To: CLERK OF COURT
U.S. DISTRICT COURT
320 6TH STREET
SIOUX CITY, IA 51101